**Alan QUIELLO, Plaintiff,**

v.

**REWARD NETWORK ESTAB-
LISHMENT SERVICES,
INC., Defendant.**

**No. CIV.A. 3:04–CV–2141.**

United States District Court,
D. Connecticut.

March 7, 2006.

**24**

Kevin A. Coles, Catherine L. Creager, Coles, Baldwin & Craft, Fairfield, CT, Robert W. Ottinger, The Ottinger Firm, P.C., New York City, for Plaintiff.

Peter Arnold Walker, Devjani Mishra, Seyfarth Shaw, New York City, Douglas John Varga, Zeldes, Needle & Cooper, Bridgeport, CT, for Defendant.

### RULING RE: CROSS MOTIONS FOR SUMMARY JUDGMENT [DOC. NOS. 13 & 27]

HALL, District Judge.

The plaintiff, Alan Quiello, brings this lawsuit against the defendant, Reward Network Establishment Services, Inc. ("RNI"), asserting claims for breach of contract and violations of Conn.Gen.Stat. §§ 31–71(e), 31–72, and 31–73 that arise out of Quiello's employment compensation arrangement with RNI.

This action was properly brought in this court on the basis of diversity jurisdiction, 28 U.S.C. § 1332.

RNI has moved for summary judgment, arguing, *inter alia*, that no genuine issue of material fact exists with regards to Quiello's inability to prove his breach of contract and statutory claims.[1] Quiello

---

1. RNI has moved for summary judgment on all claims asserted in Quiello's original com-    plaint (Counts I through V). Subsequent to RNI's motion for summary judgment, Quiello

has also cross moved for summary judgment on the claims (Counts I, II, and IV) related to payment under the 2004 compensation plan, arguing, *inter alia,* that the compensation plan in question is unambiguous and, thus, he is entitled to judgment as a matter of law.[2]  For the following reasons, RNI's motion for summary judgment is GRANTED in part and DENIED in part, and Quiello's partial motion for summary judgment is GRANTED.

## I.  FACTUAL BACKGROUND [3]

Quiello is a resident of New Haven, Connecticut.  RNI is a corporation with its principal place of business in Chicago, Illinois, and is incorporated in Delaware.  Quiello was employed by RNI, and its predecessor companies, from July 1992 until his voluntary departure in April 2005, as a "Account Executive," which is also known as a "Restaurant Consultant."

RNI establishes and administers reward and loyalty programs for restaurants and retail establishments.  In a typical restaurant agreement, RNI advances $25,000 in cash to a restaurant in exchange for $50,000 in food and beverage credits.  When a restaurant customer enrolled in an RNI loyalty program uses food and beverage credits at a participating restaurant, RNI becomes entitled to a "take" of the total amount (i.e., "spend") that the customer spends at the restaurant.  In a typi-

cal agreement, RNI would be entitled to an 80% "take" of the "spend," and the restaurant would keep the other 20%.

As an Account Executive, Quiello negotiated these credit agreements with restaurants on a commission basis.  Quiello was responsible for identifying potential restaurants to solicit within his territory and negotiating agreements with restaurants, which were subject to approval by Quiello's supervisor.  As part of this process, Quiello was responsible for evaluating, subject to his supervisor's approval, whether a restaurant was a default risk and whether additional security guarantees should be negotiated by RNI. In his declaration, Quiello states that

> [a]fter I booked a restaurant agreement I had no further responsibilities that impacted the amount of my commission on that contract.  It was not my role to get people to eat in the restaurants participating in RNI's program.  RNI had a separate business development group and a marketing group with employees whose job it was to get members to go in and eat at the restaurants.

Pl's Rule 56(a)(2) Statement, Ottinger Dec., Ex. 13 ("Quiello Dec."), ¶ 14–16.  At oral argument, RNI stated that Quiello performed some work in maintaining previously executed agreements but acknowledged that Quiello's work for each restau-

---

successfully moved to amend his complaint to add a sixth claim (Count VI) for breach of contract.

2.  Quiello has not moved for summary judgment on his claims that relate to loss compensation under the 1997 plan (Counts V and VI). In his response to RNI's Motion for Summary Judgment, Quiello also does not oppose RNI's Motion for Summary Judgment on Count III of his Complaint, and thus summary judgment is GRANTED in favor of RNI on Count III. Pl's Am. Memo. of Law in Opp., p. 1 n. 2 [Doc. No. 42].

3.  For the purposes of the instant cross-motions for summary judgment on Quiello's breach of contract claims, the court accepts facts undisputed by the parties as true.  For purposes of RNI's motion for summary judgment on Quiello's loss-reduction claims, the court accepts facts undisputed by the parties as true and resolves factual disputes in favor of Quiello where there is admissible evidence to support his assertions.

rant substantially consisted of securing the initial contracts.

Quiello's commission-based compensation was governed by a series of successive plans drafted by RNI and its predecessors. In 1997, Quiello's compensation was governed by an agreement titled "Job Description for Transmedia[4] Restaurant Consultants" (hereinafter "1997 Plan"), which established the commission formula through which Quiello was compensated. The Plan reads, in relevant part:

> All commission are deemed earned as of the date on which the Transmedia Restaurant producing the commissions has fulfilled all of the Rights to Receive Credits generated by the cash advanced to it by Company in the form of Usage. If Company experiences cash losses as a result of unusable restaurant credits at the Employee's Transmedia Restaurant, twenty-five percent (25%) of Company's loss is subtracted from the amount that would otherwise constitute the Employee's commission on that account. No commission shall be earned by Employee after the date on which the Employee ceases to be employed by the Company for any reason, without regard for which party ends the employment relationship.

Def's Rule 56(a)(1) Statement, Walker Dec., Ex. C Dec. No. 16. The 1997 Plan provided that a restaurant consultant earned 5% commission for "usage" (i.e., the redemption of credits by RNI customer members) at a restaurant for a one-year period following the execution of a restaurant agreement, and 2% commission on usage occurring after that one-year period. The Plan also provided that restaurant consultants received a base salary between $12,000 and $18,000, and a "draw ... based upon anticipated earned commissions," both of which were paid weekly. *Id.* The Plan also reads, in part:

> This Job Description is not a contract, and does not create enforceable rights ·on the part of Employees. Employment at Transmedia Restaurant Company, Inc. is at-will. Employment may be terminated for any reason, with or without cause or notice, at any time by the employee or the Company. All employment-related decisions and terms or conditions of employment are within the sole discretion of the Company. No implied contract concerning any employment term inconsistent with at-will employment is intended. The types of terms and conditions of employment within the sole discretion of the Company include, but are not limited to following: promotion; demotion; transfers; hiring decisions; compensation; benefits; qualifications; discipline; rules; hours and schedules; work assignments; job duties and responsibilities .... No Employee will have a contract of employment unless it is in writing and is signed by both the Employee and the President of Company, and approved by Company's Board of Directors.

*Id.* Under the 1997 Plan, Quiello did not become entitled to a commission in any particular amount merely upon executing a contract with a restaurant; instead, Quiello was credited for commissions only as usage occurred, and was paid a draw, subject to reconciliation and loss subtraction, based on anticipated commissions earned through usage. Pl's Rule 56(a)(2) Statement, ¶ 25 [Doc. No. 42]; Def's Rule 56(a)(1) Statement, Walker Dec., Ex. A (hereinafter "Quiello Depo."), p. 24. If a restaurant with which Quiello had executed an agreement were to close before any credits were redeemed by customers, Quiello would not receive any commission based on the executed agreement.

---

4. Transmedia was a predecessor company of RNI.

RNI maintained a "a commission reserve account" for each restaurant consultant. Def's Rule 56(a)(1) Statement, ¶ 42. As long as Quiello's commission account had a positive balance, RNI would issue a weekly draw check to Quiello. Prior to 2004, it was Quiello's responsibility to request draw checks from RNI. After the "total take" was known for a restaurant agreement, a reconciliation process occurred between RNI and the RNI salesperson to determine the final commission owed to Quiello in light of the amount paid out as draw. Quiello Dec., ¶ 5.

In March 2002, a new, one-page plan was introduced, titled "Idine Reward Network Inc.[5] Sales Compensation Structure" (hereinafter "2002 Plan").[6] Def's Rule 56(a)(1) Statement, Walker Dec., Ex. J. The 2002 Plan established a 2.9% commission rate and stated that "this rate will be reviewed year-to-year and may be adjusted at any time at the discretion of senior management." The 2002 Plan also eliminated base salaries and stated that "[s]tated representative loss rate to be reduced to 15% of cash outstanding." *Id.*

Following the implementation of the 2002 Plan, Quiello was credited 2.9% commission for all usage that occurred subsequent to April 2002, even for usage that occurred at restaurants for which the restaurant agreement was executed prior to April 2002, under the arrangement established by the 1997 Plan.

In January 2004, RNI introduced a new commission plan, which Quiello signed. The 2004 Plan, reads, in relevant part:

The Plan is not an employment contract for a definite period. You are still an at-will employee. You or RN may terminate your employment at any time without notice. . . .

The Effective Date of this Plan is January 1, 2004. The Plan does not apply to calculations for periods before the Effective Date. . . .

Each Plan replaces all oral or written proposals, agreements, or negotiations as well as all previous Incentive Compensation Plans, but any Liabilities continue and are applied under the new Plan. A Plan continues until RN amends, replaces, or terminates it. . . .

Without considering the effect on you or your Plan, RN may, at its discretion and without notice, change: your pay or any working condition (e.g., Baseline Revenue Amount, Baseline Revenue Commission %, Growth Revenue Commission %, Annual SPIF calculation, hours, benefits, or job or account assignments); or any policy relating to employment.[7]

Def's Rule 56(a)(1) Statement, Walker Dec., Ex. D. The 2004 Plan establishes that an account executive receives 1.5% commission for sales (also referred to as "take") up to a baseline amount that is established by a formula based on the salesperson's previous performance, and 6% commission for sales above the baseline. Def's Rule 56(a)(1) Statement, Walker Dec., Ex. L. The 2004 Plan also establishes that the baseline commission will be paid out in a bi-weekly draw. *Id.*

After the implementation of the 2004 Plan, RNI credited commissions to Quiello's account at the 1.5% commission rate for all usage occurring subsequent to Jan-

---

**5.** Idine Reward Network, Inc. was a predecessor of RNI.

**6.** The parties dispute whether the 2002 Plan was a new plan or an amendment of the 1997 Plan.

**7.** The 2004 Plan also includes choice-of-forum and choice-of-law provisions that neither party has sought to enforce in the instant action. Def's Rule 56(a)(1) Statement, Walker Dec., Ex. D.

uary 2004, even for restaurant agreements that had been executed prior to 2004. Quiello was paid at the 1.5% commission rate until he left RNI in April 2005.

In response to RNI's motion for summary judgment on his fifth count concerning loss reduction under the 1997 plan, Quiello states in his declaration that, from 1997 to 2002, RNI deducted 25% of the company's cash losses for a given account from the total amount of Quiello's commission reserve account. Quiello Dec., ¶ 23. After the implementation of the 2002 Plan, loss deductions continued to be made from Quiello's total commission account. *Id.* at ¶ 26.

Quiello brought this action in December 2004, asserting claims for breach of contract and violation of Conn.Gen.Stat. §§ 31–71(e) and 31–73. Quiello's complaint asserts two general theories of recovery: Counts I and II (breach of contract claims) and Count IV (violation of section 31–73) assert that RNI breach its contract with Quiello, and violated section 31–73, by applying the lower commission of 1.5% to usage for contracts that were procured by Quiello prior to January 2004. Count V asserts that RNI violated sections 31–71(e) and 31–73 by miscalculating the loss deductions warranted under the terms of the 1997 and 2002 plans.[8] RNI has moved for summary judgment on all of these claims, arguing, *inter alia*, that, under the terms of the 2004 Plan and prior Plans, Quiello cannot demonstrate that it has breached any contract with Quiello, and that Quiello's loss deduction claim is barred by the statute of limitations in Conn.Gen.Stat. § 52–596 and that it has not unlawfully deducted losses from any vested wages. Quiello has cross-moved for summary judgment on Counts I, II, and IV, arguing, *inter alia*, that the 2004 Plan

is unambiguous and that no genuine issue of material fact exists with regards to RNI's breach of its contract with Quiello. Quiello opposes RNI's motion for summary judgment on Count V, arguing, *inter alia*, that genuine issues of material fact exist with regard to the application of Conn.Gen.Stat. § 52–596 and the propriety of the loss deductions in light of the language of the 1997 Plan.

## II. LEGAL STANDARD

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000). The moving party bears the burden of showing that no genuine factual dispute exists. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir.2000) (citing *Gallo v. Prudential Residential Services, Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994)). "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir.2005)(quotation marks omitted). When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and present such evi-

---

**8.** The recently amended Count VI, which is *not* addressed in the parties' motions for summary judgment, essentially asserts the same claim under a breach of contract theory.

dence as would allow a jury to find in his favor, *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a Summary Judgment Motion." *Lipton v. The Nature Company*, 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the Summary Judgment Motion are not credible). Moreover, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Jeffreys*, 426 F.3d at 554.

## III. DISCUSSION

### A. Quiello's Breach of Contract Claims (Counts I and II)

Counts I and II of Quiello's complaint assert that RNI breached its contract with Quiello when it applied the lower commission of 1.5% to usage on contracts that were procured by Quiello prior to January 2004. Quiello asserts that this rate application was in breach of RNI's obligation to apply the commission rate that was in place at the time that a restaurant contract was procured to commissions earned under that contract, and that the rate application breached specific language in the 2004 plan. RNI contends that it was entitled, under its agreement with Quiello, to apply the 1.5% commission rate to commission earned on restaurant contracts procured before 2004

because commissions are only earned as usage occurs, and because RNI retained the discretion to prospectively change the commission rate on Quiello's restaurant contracts. At issue, therefore, is a question of contract interpretation: under the terms of the agreement between Quiello and RNI, did the commission rate for a particular restaurant agreement vest when the contract was initially booked, as Quiello claims, or did it vest only when usage occurred under the contract and commission was posted to Quiello's reserve commission account?

The contract between Quiello and RNI must be construed "to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Goldberg v. Hartford Fire Ins. Co.*, 269 Conn. 550, 559, 849 A.2d 368 (2004)(quoting *Poole v. Waterbury*, 266 Conn. 68, 87–88, 831 A.2d 211 (2003)). "The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and ... the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Id.*

In Connecticut, "[a]lthough the question of contract interpretation, being a question of the parties' intent, is a question of fact, where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." *Hanks v. Powder Ridge Restaurant Corp.*, 276 Conn. 314, 322, 885 A.2d 734 (2005)(quoting *Goldberg*, 269 Conn. at 559–60, 849 A.2d 368). "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous ... By contrast, language is unambiguous when it has a definite and

precise meaning ... concerning which there is no reasonable basis for a difference of opinion." *Goldberg*, at 373–74.

Examining the 2004 Plan, which, by its own terms, was the operative document establishing the contractual relationship between Quiello and RNI when the 2004 commissions were posted to Quiello's account, the court cannot conclude that the Plan itself contains definitive and unambiguous language that is dispositively responsive to the vesting-timing question posed by the parties. Unlike the 1997 Plan, for example, the 2004 Plan contains no language that specifically addresses when commissions are earned.

■ Both parties have directed the court to evidence extrinsic to the 2004 Plan itself to support their assertions about the parties' intent. Specifically, Quiello argues that the 2004 Plan should be understood in light of RNI's practices concerning restaurant evaluation and the posting of commissions, and RNI argues that the Plan should be understood in light of language in the 1997 and 2002 Plans. Such parol evidence may be admitted to aid in contract interpretation where it is relevant "(1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud." *HLO Land Ownership Assocs. v. Hartford*, 248 Conn. 350, 359, 727 A.2d 1260 (1999). It may not be admitted, however, to "vary or contradict the written terms of an integrated contract." *Id.* While the 2004 Plan, by its terms, superceded all previous plans, the extrinsic evidence identified by the parties here may be used to help explain ambiguities in the 2004 Plan without changing or modifying its terms.

When the contract between Quiello and RNI is viewed in light of the undisputed evidence put forward by the parties, the court finds that no reasonable fact finder could conclude that RNI's view of the intent of the parties with regard to the vesting of commission rights has a basis in the language of the 2004 Plan or in the surrounding circumstances. RNI's position is untenable for several reasons. First, as Quiello points out, the 2004 Plan states that "[t]he Plan does not apply to calculations for periods before the Effective Date." Def's Rule 56(a)(1) Statement, Walker Dec., ex. D. RNI argues that this statement is intended to mean that the 1.5% commission rate would not be applied to usage that occurred prior to January 1, 2004. Def's Am. Reply Memo., p. 12 [Doc. No. 37]. However, as Quiello argues, under RNI's view of commission vesting, i.e., commissions are earned as usage occurs, there would never be a need to calculate commissions for prior usage periods because they would already have been subject to calculation under the prevailing commission rate. Therefore, RNI's interpretation of the contract would render this provision in the 2004 Plan superfluous.

In contrast, this language lends support to Quiello's view of vesting. The language suggests that the 2004 Plan is not meant to be retroactive in some respect, which, as Quiello argues, supports his position that the 2004 Plan does not apply to the commission rates on contracts procured before 2004. Under RNI's view, there would be no need to include language concerning the retroactive application of the 2004 Plan because no retroactive calculations would need to be completed.

Second, and significantly, RNI's interpretation of the contract would result in the formation of an illusory contract. "Words of promise do not constitute a promise if they make performance entirely

optional with the purported promisor ... [w]here the apparent assurance of performance is illusory it is not consideration for a return promise." *O'Sullivan v. Bergenty,* 214 Conn. 641, 656, 573 A.2d 729 (1990)(Shea, J., dissenting)(quoting 1 Restatement (Second), Contracts §§ 76–77). It is undisputed that, for any given restaurant contract, Quiello substantially performed his work for RNI when the restaurant contract was procured. Accordingly, Quiello's consideration under his contract with RNI essentially consisted of his procuring contracts for RNI. In exchange, it is undisputed that Quiello would not receive a commission on the basis of the value of the contract, but, instead, a commission on the basis of usage when it occurred in the future. In other words, for the work that Quiello performed, he received a promise from RNI to be compensated, on a commission percentage basis, if usage occurred under the restaurant contract. Quiello does not dispute that he was not entitled to any commission unless usage occurred; he accepts RNI's contention that commission is earned only upon usage. However, if RNI was able to change the commission rate on a contract previously procured by Quiello, i.e. for which Quiello has already performed his consideration, then RNI effectively made no binding promise to Quiello in exchange for his work. Under its interpretation of its contract with Quiello, RNI would be free, after Quiello had secured a restaurant contract but before any usage occurs under it, to change the commission rate on future usage to 0% or some nominal amount. Given the discretion that RNI reserves for itself in the 2004 and earlier plans, there is no restriction, either express or implied, that would render RNI's "promise" to pay future commissions for work already performed non-illusory. *See Sicaras v. City of Hartford,* 44 Conn.App. 771, 780, 692 A.2d 1290 (1997)("If there is

a restriction, express or implied, on the promisor's ability to terminate or to refuse to perform, the promise is not illusory."). It appears clear to the court that, to avoid the creation of an illusory contract, Quiello's interpretation of the contract must be correct, and he must be entitled to the commission rate in place on the day that a restaurant agreement is procured, even if he was not entitled to any commission payments until usage occurred. *See Hartford Elec. Applicators of Thermalux, Inc. v. Alden,* 169 Conn. 177, 179, 363 A.2d 135 (1975)(implying duty to defendant under contract to avoid rendering contract illusory).

RNI argues that language in the 1997 Plan supports its assertion that it could change the commission rate for usage under restaurant contracts that had been previously procured by Quiello. In the 1997 Plan, it looks for support in the statement that "[a]ll commissions are deemed earned as of the date on which the Restaurant producing the commissions has fulfilled all the Rights to Receive Credits ...." Def's Rule 56(a)(1) Statement, Walker Dec., ex. C. RNI argues that this language supports its assertion that Quiello did not "earn" any commission until usage occurred, and thus it was free to change the commission rate for usage that had not yet occurred. In making this argument, RNI conflates two separate concepts: 1)the vesting of a particular commission rate, and 2) the entitlement to a particular commission payment at a certain point in time. Thus, the language in the 1997 Plan could be read as consistent with Quiello's view if "deemed earned" is understood only as "entitled to payment," and not as "vesting of commission rate." The language in the 1997 Plan does not necessarily compel the court to conclude that a commission rate, as opposed to the commission itself, only vests when usage

occurs. Given the concern over the creation of an illusionary contract, RNI's interpretation of "earned" to encompass both concepts is unreasonable.

Third, the interpretation of the 2004 Plan urged by RNI is not merely "prospective" in the way that RNI suggests. RNI argues that, as an at-will employer, and under the terms of the 2002 agreement, it has the discretion to make prospective changes to Quiello's conditions of employment. RNI notes that the 2002 Plan stated that the commission rate "will be reviewed year-to-year and may be adjusted at any time at the discretion of senior management." Def's Rule 56(a)(1) Statement, Walker Dec., ex. J. It contends that, because Quiello's commissions were not yet "earned," any changes that it made to Quiello's commission rate on contracts with outstanding usage were prospective. In support of its position, RNI cites to several cases for the proposition that an at-will employer is free to make prospective changes to the conditions of employment of an employee. *Fahim v.CIGNA Invs., Inc.*, No. 3:98CV232, 1998 WL 1967944, at *3 (D.Conn. Sept. 10, 1998); *Mesenbourg v. Dun & Bradstreet Software Servs.*, 3:97CV02291(AWT), 2001 WL 256153(D.Conn. Mar. 8, 2001); *Carey v. Conn. Gen. Life Ins. Co.*, 93 F.Supp.2d 165, 169 (D.Conn.1999); *Perrotti v. DPL Refuse Services*, No. 65358, 1994 WL 197727, at *1 (Conn.Super. May 12, 1994). However, to the extent that these cases stand for such a proposition, they also demonstrate that the 2004 Plan is not merely a "prospective" change of employment conditions if it is applied in the way that RNI contends it should be, i.e., that it can change the rate of compensation for work already performed by Quiello. In *Fahim* and *Carey*, for example, the plaintiffs were found to have consented to arbitration agreements proposed by the employer defendants. 93 F.Supp.2d at 169.

The prospective nature of the agreement to arbitrate future disputes is distinguishable from the application of a new rate of commission to usage on a contract that had previously been procured. Similarly, in *Perrotti*, the plaintiff was found, as an at-will employee, to have accepted a reduction in weekly salary and draw on commissions. 1994 WL 197727 at *1. A change in salary and draw is prospective in a way that the changed rate of commission in the instant case is not, as an agreement to pay a certain salary is a promise of compensation for work yet to be performed, rather than, as in the instant case, work already performed.

RNI also relies in its pleadings on *O'Shea v. Bidcom, Inc.*, No.01CIV3855WHP, 2002 WL 1610942 (S.D.N.Y. July 22, 2002), which has a similar factual predicate as the instant case. In *O'Shea*, the plaintiff booked a contract which would have arguably entitled him to a commission of $223,000. *Id.* at 2002 WL 1610942, *2. Subsequent to the booking of the contract, the defendant changed the compensation plan such that commissions were paid not on booking value of a contract but on revenue earned under a contract, and the defendant refused to pay the plaintiff his full commission. *Id.* The defendant argued that the commission plan was not a contract but a discretionary policy which it could change at will. *Id.* at 2002 WL 1610942, *3. The district court noted that "[i]t is axiomatic that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive." *Id.* However, it went on to note that "if the incentive constitutes a term of employment and there exists a reasonable basis for calculating the compensation incentive due an employee a court may enforce the contract

term." *Id.* (internal quotation marks omitted). The court concluded that the commission plan lacked the "magic words" necessary to vest absolute discretion regarding compensation incentives in the employer, and that, through the use of words such as "earned" with regard to the incentive compensation, the plan created a contractual obligation for the defendant to pay the plaintiff's commission in accord with the terms and conditions of the plan. *Id.* at 2002 WL 1610942, *4.

RNI cites *O'Shea* for the proposition that "an employer's reservation of discretion to change a compensation plan with respect to rights that have not vest under the terms of the plan is enforceable." Def's Am. Reply, p. 11. This overstates the holding in *O'Shea:* the case only stands for the narrower proposition that where an employer has retained absolute discretion over a type of compensation to which the employer has no contractual right, the employee may not make a contractual claim. Here, as in *O'Shea,* the language in the Plans that reserve to RNI the right to change the commission rate does not vest RNI with the discretion to pay no commission at all (assuming usage occurs), and does not "unambiguously" vest RNI with absolute power to revise commission rates for previously procured contracts. *Id.* at 2002 WL 1610942, *3. As in *O'Shea,* it appears that Quiello can make a contractual claim for the vesting of his commission rate in accordance with the terms of the governing plans.

Therefore, the court finds that, on the basis of the language of the 2004 Plan and the undisputed evidence produced by the parties, that Quiello's interpretation of his contract with RNI, i.e., that the *commission rate* on a restaurant contract, but not the commission itself, vests when the contract is procured, the only fair and reasonable understanding of the parties' intent that could be found by a reasonable fact finder. The undisputed evidence also demonstrates that RNI breached this contract by paying Quiello a lower rate in 2004 for contracts that were procured prior to 2004. Therefore, summary judgment in favor of Quiello is GRANTED on Counts I and II of Quiello's complaint, and RNI's motion for summary judgment on those claims is DENIED.[9]

## B. Quiello's Claims under Conn.Gen. Stat. § 31–73 (Count IV)

The fourth and fifth counts of Queillo's complaint assert causes of action under section 31–73 of the Connecticut General Statutes. Section 31–73(b) states that "[n]o employer … shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person … upon the representation that such refund of wages … is necessary to secure employment or continue in employment." Conn.Gen.Stat. 31–73(b). A "refund of wages" is defined elsewhere in the statute as "payment by the employer or his agent to an employee of wages at a rate less than that agreed to by the employee…." Conn.Gen.Stat. § 31–73(a)(2).

Section 31–73, however, does not appear to provide a private cause of action to plaintiffs, nor is it expressly covered by the private right of action created by Conn.Gen.Stat. § 31–72. *Compare* Conn.

---

**9.** RNI also argues that Quiello has failed to repudiate his contract with RNI because he ratified the contract by failing to request adjustments of his disputed payments in writing to RNI, and by accepting commission payments from RNI in 2004. Def's Reply Memo. of Law, p. 6. Quiello, however, has not sought to repudiate his contract with RNI but only to enforce what he argues is the fair and reasonable interpretation of the parties' intent, as evidenced by the written contract and the surrounding circumstances.

Gen.Stat. § 31–73(d)("Any person who violates any provision of this section shall be fined not more than one hundred dollars or imprisoned not more than thirty days . . . .") *with* Conn.Gen.Stat. § 31–72 ("When any employer fails to pay an employee wages in accordance with the provisions of sections 31–71a to 31–71i, inclusive, or fails to compensate an employee in accordance with section 31–76k . . . such employee . . . may recover, in a civil action, twice the full amount of wages . . . ."); *see also Dougherty v. Dougherty,* No. CV030089577, 2005 WL 2207121 (Conn.Super. Aug. 16, 2005)(striking claim brought under section 31–72 that only stated violation of section 31–73). Therefore, RNI's motion for summary judgment is GRANTED and Quiello's motion for summary judgment is DENIED as to Count IV of Quiello's complaint and as to Count V of Queillo's complaint to the extent it asserts a cause of action under section 31–73.

### C. Quiello's Claim under Conn.Gen. Stat. §§ 31–71e and 31–72 (Count V)

In Count V, Quiello asserts a claim under Conn.Gen.Stat. §§ 31–71(e) and 31–72, alleging that RNI wrongfully deducted cash losses from his commission account in violation of the terms of his employment agreement with RNI. Specifically, Quiello asserts that, in breach of the language of the 1997 Plan regarding loss deduction, RNI deducted losses from Quiello's total commission account instead of only from the account pertaining to the restaurant that generated the loss.

Section 31–71e provides that:

[n]o employer may withhold or divert any portion of an employee's wages unless (1) the employer is required or empowered to do so by state or federal law, or (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner, or (3) the deductions are authorized by the employee, in writing, for medical, surgical, or hospital care or service, without financial benefit to the employer and recorded in the employer's wage record book.

Conn.Gen.Stat. § 31–71e. Section 31–72 expressly provides a private cause of action for violation of section 31–71e.

RNI advances several arguments in support of its motion on summary judgment on Count V. First, it argues that Quiello's claim is barred by the two-year statute of limitations established by Conn.Gen.Stat. § 52–596, which states that, "[n]o action for the payment of remuneration for employment payable periodically shall be brought but within two years after the right of action accrues . . . ." In response, Quiello argues that his commission payments were not "payable periodically" under the meaning employed in section 52–596, and are thus covered instead by the six-year statute of limitation on contract actions established by Conn.Gen.Stat. 52–576.

In *Duplissie v. Devino,* No. CV000158151, 2005 WL 1391107 (Conn.Super. May 9, 2005), the Connecticut Superior Court found that, "although the term 'periodically' is not defined by statute, the manifest purpose of the provision is to cover employment wages that are payable on recurring, fixed intervals." *Id.* at 2005 WL 1391107, *5. The court in *Duplissie* noted that the plaintiff had a right to defer payment of his compensation, which he had exercised at least once, and found that, "because the remuneration was not necessarily 'payable periodically' the two-year statute of limitations contained in § 52–596 does not apply." *Id.*

It is undisputed that, prior to 2004, it was Quiello's responsibility to request the draw checks that he received from RNI. It

is also undisputed that, under the terms of the 1997 and 2002 agreements, Quiello was liable to RNI for losses that could exceed the amount that he had received in draw. It appears to the court that, as in *Duplissie,* the advances that the Queillo received on his draw account did not constitute "remuneration for employment payable periodically," and, thus, section 52–596 does not bar Quiello's claim. Conn.Gen.Stat. § 52–596.

■ RNI also argues that summary judgment is appropriate on Quiello's claim under section 31–71e because the loss-based deductions that it made from Queillo's commission account were not taken from "vested" or "earned" commissions, but only commissions that had not yet fully vested. RNI argues that under the 1997 and 2002 plans it was entitled to make such deductions, and section 31–71e provides no substantive restriction on its ability to do so. *See Mytych v. May Department Stores Co.,* 260 Conn. 152, 162, 793 A.2d 1068 (2002). However, Queillo does not argue that RNI was not entitled to make any deductions at all under section 31–71e, but merely that the deductions that RNI made under the 1997 and 2002 Plans exceeded what was authorized by the language in those plans. Thus, Queillo's claim is appropriately based in the terms of his agreement with RNI.

Specifically, Quiello relies on the language in the 1997 Plan which states:

If Company experiences cash losses as a result of unusable restaurant credits at the Employee's Transmedia Restaurant, twenty-five (25%) of Company's loss is subtracted from the amount that would otherwise constitute the Employee's commission on that account.

Def's Rule 56(a)(1) Statement, Walker Dec., Ex. C. Quiello argues that the language regarding "that account" demonstrates that RNI was only entitled to sub-tract losses from the commission account pertaining to the individual restaurant responsible for the loss, and not from Quiello's total commission account, as was RNI's practice. At oral argument, RNI suggested that "that account" referred to the total commission account for Quiello, in the sense of "each restaurant consultant's account." RNI's interpretation of "that account" is unreasonable in the context of the sentence in which it appears; "that account" plainly refers to the account pertaining to the "Transmedia Restaurant" at issue, rather than the sum of all of the employee's accounts. Quiello has thus demonstrated that a genuine issue of material fact exists with regard to his claim under section 31–71e for wrongful withholding on the basis of the loss deduction language in the 1997 Plan.

The language regarding loss deductions in the 2002 Plan does not contain a similar limitation on the "account" from which a loss may be deducted. Unlike the language in the 1997 Plan, the language in the 2002 Plan "[s]ales representative loss will be reduced to 15% of cash outstanding" could be interpreted to apply to Quiello's total commission account. Def's Rule 56(a)(1) Statement, Walker Dec., Ex. J. However, RNI asserts elsewhere that the 2002 Plan was only an amendment to the 1997 Plan, and thus, under RNI's own factual assertions, the language of the 1997 Plan regarding loss limitations could be incorporated into the 2002 Plan. Def's Rule 56(a)(2) Statement, ¶ 36. A genuine issue of material fact thus exists with regards to Quiello's section 31–71e claim regarding the loss deductions that occurred under the 2002 Plan as well. Accordingly, RNI's motion for summary judgment on Quiello's Count V is DENIED.

## IV. CONCLUSION

For the foregoing reasons, the defendant's summary judgment motion [Doc.

No. 13] is DENIED as to Counts I and II of the plaintiff's complaint, GRANTED as to Counts III and IV of the plaintiff's complaint, and GRANTED as to Count V of the plaintiff's complaint only to the extent it asserts a cause of action under Conn.Gen.Stat. § 31–73. The plaintiff's cross motion for summary judgment [Doc. No. 27] is GRANTED as to Counts I and II and DENIED as to Count IV. Counsel are to confer within seven days and then file a status report setting forth the issues that the parties identify as unresolved and proposing a plan/schedule to address them in a prompt, efficient manner.

**SO ORDERED.**