HAMILTON, Circuit Judge,
concurring in part and dissenting in part.
I agree with my colleagues that the CEC supplemental compensation plan was an enforceable contract and that there is not currently any need to pursue a claim of unjust enrichment. I agree with Judge Darrow that plaintiff Wilson is entitled to pursue his claim for bad faith breach of the contract with CEC, both in his own right and potentially on behalf of a plaintiff class. I respectfully disagree with my colleagues, however, on Wilson’s straight breach of contract claim that does not require proof of subjective bad faith. I dissent from the affirmance of the district court’s Rule 12(b)(6) dismissal of that theory. I address first why Wilson has alleged a viable claim for breach of contract and then turn briefly to the bad faith theory that Wilson can pursue on remand and his unjust enrichment theory.
I. Breach of Contract
The contract here is defendant’s “Supplemental Compensation Plan for Admissions Representatives—2010.” The Plan was detailed and formal, with more than a *677 page of definitions and detailed examples to illustrate the calculation of payments. Although these supplemental payments are sometimes called bonuses, they were not discretionary and they were also important, making up a significant part of an admissions representative’s compensation. Cf. Tatom v. Ameritech Corp., 305 F.3d 737, 742-44 (7th Cir.2002) (no enforceable promise of bonus where calculation and payment were left to employer’s discretion and dependent upon its overall financial success). Plaintiff Wilson has advised that when the Plan was cancelled, the payments were roughly one-third of his total compensation.
While the Plan was in effect, the delayed payment of the supplemental compensation or bonuses was subject to two, but only two, explicit conditions: (1) to be counted toward a bonus, an enrolled student had to complete the shorter of a full course or one year of study; and (2) the admissions representative had to be employed by CEC when the student satisfied that condition. The first condition was a sensible step to discourage abusive practices in which federally guaranteed loans were made to students who had neither the ability nor the intention to pursue the course of studies. The second condition is fairly common in bonus and sales commission plans.
My colleagues and I all agree that the Plan was an enforceable contract and that CEC was free to amend or terminate it. That right to amend or terminate is the source of CEC’s defense and the focal point of my disagreement with my colleagues on this claim. My colleagues and I agree that this right was not unlimited. The contract would have been illusory otherwise. We also agree that the right to amend or terminate could not be applied retroactively. We disagree on what it means to apply an amendment or termination retroactively.
In analyzing the limits on amendment or termination, we must consider three time-frames: (1) prospective application of an amendment to bonuses for students not yet enrolled; (2) completely retroactive application of an amendment, including as applied to bonuses for students for whom all conditions had been satisfied at the time of amendment; and (3) application of an amendment to bonuses for students “in the pipeline,” where the admissions representative had done all of his or her work but the other conditions had not yet been satisfied. (There is a fourth variation concerning the effect of the new Department of Education regulations that made enrollment bonuses unlawful for covered education companies effective July 1, 2011, but the parties do not disagree about that possibility.)
With respect to the first time-frame, my colleagues and I agree that CEC could amend or terminate the plan on a prospective basis, as applied to bonuses for students who had not yet enrolled. Such a right to amend or terminate is essential. For example, an employer may miscalculate and learn it cannot afford to sustain a bonus or sales commission plan on a long-term basis. Admissions representatives who did not like a change in the terms of their employment would be free to reject the change by leaving the company. CEC recognized the need to reserve that right for itself and included such a provision explicitly in its contract.
With respect to the second time-frame, my colleagues and I agree that CEC was bound by the terms of the Plan to pay bonuses due where the express conditions in the Plan had been met—the student completed the required studies and the admissions representative was still employed by CEC when the bonus became payable. After both the express conditions had been satisfied, CEC could not *678 make a retroactive change to the plan that would relieve it of its obligation to pay bonuses already earned. To put it another way, all members of the panel reject CEC’s assertion in oral argument that it could rely on its reserved power to amend or terminate and simply refuse to pay under those circumstances. Otherwise, the Plan would certainly have been illusory and we should allow Wilson to proceed on his unjust enrichment claim.
My disagreement with my colleagues is over the third time-frame: whether CEC could use its power to modify or terminate the Plan to refuse to pay bonuses for students in the pipeline—those who had enrolled but not yet completed the milestone of one year or a complete program. As to those students, plaintiff Wilson had done all of his work and was waiting to see who finished their studies and how many bonuses he would earn.
What did the written Plan tell us about this question of the pipeline? Virtually nothing. Regarding this third time-frame, the contract was silent. When the contract is read as a whole, the silence is especially telling. By looking at the two specific conditions that could defeat a bonus claim—the student drops out or the admissions representative’s employment ends—my colleagues conclude that Wilson and other admissions representatives should have figured out that CEC also claimed to retain a right to cancel bonuses for students still in the pipeline even where the two express conditions were later satisfied. See post 684-85 (opinion of Wood, J.).
With respect, the conclusion simply does not follow from the premises. The critical difference is obvious. The contract was not silent on what would happen to Wilson’s bonuses if students dropped out or if he was fired or quit. It was very explicit. It included several paragraphs explaining under what circumstances an employee was or was not entitled to a bonus. It also included several examples to ensure the employees understood those conditions. Those detailed provisions told the employees, and tell us, nothing about the very different possibility, that the employer would simply decide one day to keep all the employees’ pipeline bonuses for itself—even where both the express conditions were later satisfied.
The Plan’s express reservations concerning termination gave employees fair notice that they could not rely on their bonuses, even after having performed all of their work, if the student did not graduate or the employee’s employment had ended. But contrary to my colleagues’ view, it is not reasonable to expect Wilson to have understood that the contract’s silence about any right to amend or terminate the program for pipeline bonuses meant that CEC also reserved the right to just keep those bonuses even when both conditions were later satisfied. Where CEC had done such a thorough job of disclaiming obligations to pay in two other situations, termination of employment or students’ failures to complete their studies, it is more reasonable to expect CEC to have reserved explicitly the right to refuse to pay in this “pipeline” situation.
Where CEC was explicit about the right to withhold bonuses in one situation but not in another, it is more reasonable to interpret that silence as intentional, consistent with the principles that a contract must be interpreted as a whole and that the expression of one or a few specific items (such as conditions to defeat a bonus) often implies the exclusion of others. E.g., Martindell v. Lake Shore Nat’l Bank, 15 Ill.2d 272, 154 N.E.2d 683, 689 (1958) (construe contract as a whole); Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 324 (Minn. *679 2003) (same); Rickher v. Home Depot, Inc., 535 F.3d 661, 668 (7th Cir.2008) (Illinois law uses expressio unius est exclusio alterius as rule of construction, though it does not override clear language to the contrary); In re Ruth Easton Fund, 680 N.W.2d 541, 550 (Minn.App.2004) (same under Minnesota law). Cf. Duldulao v. Saint Mary of Nazareth Hosp. Center, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314, 318-19 (1987) (where employment contract included list of behaviors that would result in immediate dismissal, it was reasonable for employee to infer that other, unlisted behaviors would not subject her to immediate dismissal).
The most that can be inferred from the Plan’s silence on this point is that it is ambiguous as applied to bonuses for students in the pipeline. See Consolidated Bearings Co. v. Ehret-Krohn Corp., 913 F.2d 1224, 1233 (7th Cir.1990) (explaining that silence creates ambiguity “when the silence involves a matter naturally within the scope of the contract as written,” and that a “contract is not ambiguous merely because it fails to address some contingency; the general presumption is that the rights of the parties are limited to the terms expressed in the contract”) (internal quotations omitted). When we consider a motion to dismiss on the pleadings, we should not treat contractual silence as if it were an express disclaimer that favors one party. “A court may not rewrite a contract to suit one of the parties but must enforce the terms as written. Thus, the rights of the parties are limited by the terms expressed in the contract.” A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp., 132 Ill.App.3d 325, 87 Ill.Dec. 429, 477 N.E.2d 30, 33 (1985) (internal citations omitted). The Plan’s silence on the issue did not give CEC the right to terminate bonuses for students in the pipeline where both express conditions were later met.
Given the ambiguity of the Plan language, the court should also be open to parol evidence about the parties’ past course of dealings. We were told in oral argument that CEC had made changes to the bonus Plan in the past, but that it had done so only on a clearly prospective basis, for students not yet enrolled.[1] If Wilson can support that assertion with evidence, it would be relevant to, and might even be highly probative of, the parties’ understandings about whether the Plan language gave CEC' the right to amend or terminate the Plan as applied to students in the pipeline. Such evidence would also be relevant to Judge Wood’s assertion, post at 685, that Wilson “should have realized” that there were more than two situations in which an employee who fully performed could still be denied the bonuses.
The transparent unfairness of CEC’s cancellation of the pipeline bonuses also should make us hesitate to interpret an ambiguous contract in this way. CEC admits that it deliberately induced the admissions representatives to rely on these promises and that it gained the benefit of their work above and beyond the call of duty. It then decided to keep for itself as much of that benefit as it thought it could get away with. Wilson had done all of his work to recruit the students in question. He seeks payment only for students as to whom the only express conditions on payment of the bonuses were in fact satisfied. It was not fair for CEC to change the rules in the middle of that game, and certainly not without clear warnings that it *680 reserved the right do so. Much of contract law is designed to fill in the blanks in a contract in a way that we think the parties most likely would have agreed if they had addressed the point specifically. This contract gives us no reason to expect that the employees should have known they were agreeing to give CEC complete power to act opportunistically, to take back the promised bonuses after it had received the benefits of the employees’ efforts.
Then-Circuit Judge Scalia explained this point for the D.C. Circuit. An employer retroactively raised a sales representative’s sales quotas used to calculate commissions and then terminated his employment. The employer claimed its commission plan gave it complete discretion to take these actions. The court rejected the employer’s argument in terms that apply here: “Where what is at issue is the retroactive reduction or elimination of a central compensatory element of the contract—a large part of the quid pro quo that induced one party’s assent—it is simply not likely that the parties had in mind a power quite as absolute as [the employer] suggests. In the present case, agreeing to such a provision would require a degree of folly on the part of these sales representatives we are not inclined to posit where another plausible interpretation of the language is available.” Tymshare, Inc. v. Covell, 727 F.2d 1145, 1154 (D.C.Cir.1984) (reversing summary judgment in favor of former employee and remanding for trial on bad faith claim, applying general principles of contract law).
Along these same lines, Judge Posner has written, “the fundamental function of contract law (and recognized as such at least since Hobbes’s day) is to deter people from behaving opportunistically toward their contracting parties, in order to encourage the optimal timing of economic activity and to make costly self-protective measures unnecessary.” Richard A. Posner, Economic Analysis of Law 81(3d ed.1986), quoted in Jordan v. Duff and Phelps, Inc., 815 F.2d 429, 438 (7th Cir.1987) (reversing summary judgment and ordering trial on claims by former employee-shareholder). That logic applies here. It is not appropriate to interpret the contract’s silence to allow CEC’s opportunistic grab to keep the pipeline bonuses, and certainly not to do so without evidence of either past dealings or Wilson’s actual knowledge.
Judge Hall solved this problem correctly in Quiello v. Reward Network Establishment Services, Inc., 420 F.Supp.2d 23 (D.Conn.2006). Her opinion is persuasive as a matter of general contract law, and the relevant facts are not distinguishable from this case. In Quiello, the plaintiffs job was to sign up restaurants to participate in loyalty and reward programs. His employer provided for sales commissions under plans that it could amend or terminate at any time, as here. After the plaintiff signed up a restaurant, he had no further responsibilities for the account. The ultimate payment of the commissions depended on factors beyond the plaintiffs control, including the restaurant’s continued participation and customer usage levels. See id. at 26. The employer then not only reduced the commission for new sales, which it surely had the right to do, but also tried to reduce the commissions for restaurants that the plaintiff had signed up before the effective date of the new plan.
Quiello thus shares with this case: (1) an employee who performed all of his work toward sales commissions or bonuses; (2) the ultimate payment of which was subject to conditions that were outside his control; (3) an employer that tried to use its power to amend the contract to reduce its obligation to pay commissions for the “pipeline” business; and (4) contract language *681 that was ambiguous as to the ability to impose the amendment on pipeline business. The court in Quiello correctly reasoned that the ambiguous contract should be interpreted in the fairer, more reasonable manner as not applying to pipeline business. Id. at 30-32. The Quiello court actually granted summary judgment in favor of plaintiff on his breach of contract claims. It would be premature for us to go so far in this appeal, of course, but the reasoning of Quiello is sound, applies here, and calls for reversal of the district court’s dismissal.[2]
II. Bad Faith Termination
Wilson also argues that even if the Plan gave CEC the power to cancel pipeline bonuses, it breached a duty of good faith and fair dealing by cancelling bonuses four months before the new federal regulations took effect to prohibit them. This duty of good faith and fair dealing is particularly important where one party reserved a discretionary right to modify or terminate the contract in a way that would give that party the opportunity to take unfair advantage of the other. See Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc., 225 F.3d 876, 884 (7th Cir.2000) (applying Illinois law and reversing summary judgment where defendant’s good or bad faith was genuinely disputed issue). Even if CEC had such a reserved power, Judge Darrow correctly explains that it had a duty to exercise that power in good faith, and the district court erred by dismissing this claim on the pleadings.
I therefore concur in Parts II and III of Judge Darrow’s opinion and offer a few further observations about the bad faith theory. Plaintiff Wilson has alleged a solid factual basis for inferring bad faith. CEC argues it was just being a good citizen. It was acting to comply with new federal regulations that prohibited such bonuses in the for-profit education world.[3] But CEC made this change effective four months before the regulations took effect. By taking that step, Wilson alleges, CEC simply kept for itself more than $5 million it should have paid to its admissions representatives. That looks like the “avowedly opportunistic conduct” that we recognized as actionable in Jordan v. Duff and Phelps, Inc., 815 F.2d 429, 438 (7th Cir.1987) (applying Illinois law).
Perhaps CEC can persuade a trier of fact that its seizure of more than $5 million was merely a fortuitous side effect of its desire to be a good citizen by complying with the new regulations before it was required to do so. But CEC’s reliance on the regulations as a defense could reasonably be deemed a pretext for simple greed at the expense of the admissions representatives who contributed to its success. This issue of good or bad faith cannot be resolved in favor of CEC on the pleadings alone. Given the documentary evidence before us even on the pleadings, it seems unlikely the issue could be resolved on summary judgment as well.
It will be important on remand to focus on the correct issue, which is the timing of the termination. All members of the panel *682 agree that CEC could terminate the Plan when the new Department of Education regulations took effect on July 1, 2011. The critical issue on remand is whether CEC acted in bad faith in deciding to terminate the Plan earlier than required so as to seize for itself the pipeline bonuses that Wilson and other admissions representatives were reasonably expecting to be paid as students completed their studies.
Judge Darrow has framed the issue in terms of whether CEC acted contrary to the reasonable expectations of the parties. See also Tymshare, Inc., 727 F.2d at 1154—55. The relevant expectations are those based on the objective indications of CEC’s promises and behavior, including CEC’s past course of dealing with Plan amendments. The objective view of the admissions representatives’ expectations is important for purposes of class certification, as well, for the decision on the bad faith claim should focus on CEC’s motives, applicable to all, and not on circumstances unique to each employee.
III. Unjust Enrichment
Throughout this litigation, CEC has argued that its Plan was only an illusory contract and that its admissions representatives were chumps if they thought they had actually been promised anything the law would recognize. My colleagues and I agree that CEC is wrong about that, but CEC seems unable to resist the temptation to continue trying to make the contract illusory. It would not surprise me if CEC were to try on remand to develop a new theory for rendering the Plan only an illusory contract. If that happens, the district court should consider allowing Wilson to amend his pleadings to restore the claim that we reject at this stage of the proceedings. That is, notwithstanding our decision today, it is at least possible that CEC could try to defend itself on the surviving claim in such a way as to resuscitate the unjust enrichment claim. See Fed. R. Civ. P. 15(b); 6A Wright & Miller, Federal Practice & Procedure § 1493 (3d ed.2013) (explaining liberal use of Rule 15(b) to amend pleadings to enable just resolution of suits).
If the CEC Plan were an illusory contract, then Wilson would have a viable claim for unjust enrichment under either Illinois or Minnesota law. To state an unjust enrichment claim under Illinois law, “a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiffs detriment, and that defendant’s retention of the benefit violates the fundamental principles of justice, equity, and good conscience.” HPI Health Care Servs., Inc. v. Mt. Vernon Hosp. Inc., 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (1989). The elements are phrased differently but seem to be essentially the same under Minnesota law. Southtown Plumbing, Inc. v. Har-Ned Lumber Co., 493 N.W.2d 137, 140 (Minn.App.1992); see also Cady v. Bush, 283 Minn. 105, 166 N.W.2d 358, 361-62 (1969) (theory of unjust enrichment can “support claims based upon failure of consideration, fraud, mistake, and other situations where it would be morally wrong for one to enrich himself at the expense of another”).
Wilson has alleged facts supporting all of these elements. First, CEC induced performance by the plaintiff and other admissions representatives. It did so by making these very specific promises of bonuses, which CEC even admits it wanted and expected its admissions representatives to rely on. Second, CEC received a benefit as a result of that reliance. Employees worked above and beyond the call of duty, exceeding the standards set for their performance and recruiting enough students to earn bonuses, which provided substantial benefits to CEC itself. Third, *683 even though all conditions for paying the bonuses had been satisfied, CEC refused to pay the bonuses it had offered. Finally, as plaintiff Wilson has argued, one could reasonably find that CEC acted in bad faith and that it would be unjust and/or morally wrong to allow CEC to retain the benefit discussed above under both Illinois and Minnesota law. For these reasons, the district court should stay alert on remand to the possible need to revive the unjust enrichment theory if CEC continues to try to show the Plan was only illusory.
Finally, the district court also rejected unjust enrichment on a flawed alternative theory: that an employer is not unjustly enriched by withholding a promised bonus because the employee was still paid his base salary. Wilson v. Career Educ. Corp., 2012 WL 1246328, at *8 (N.D.Ill. 2012), citing Hegel v. Brunswick Corp., 2011 WL 1103825, at *9 (E.D.Wis.2011). That reasoning is sound when the prospect of a bonus is left to management’s discretion, as was the case in Hegel itself. See 2011 WL 1103825, at *5 (employer reserved right to “revise, discontinue or cancel this plan or any awards associated with the plan at any time,” thus promising to render future performance only if it decided to do so) (emphasis added). That reasoning does not extend, however, to a case like this one, where the promise of bonuses was specific and was conditioned only on express conditions that were actually satisfied. Without that limit, the district court’s reasoning would call into question the enforceability of any contractual sales commissions so long as the sales representative is also paid a base salary. Yet such promises of sales commissions are regularly enforced, of course.
For these reasons, I join in the judgment reversing and remanding the case to the district court on plaintiffs bad faith theory, but I respectfully dissent from the rejection of his conventional breach of contract theory.

. "A party who appeals from a Rule 12(b)(6) dismissal may elaborate on her allegations so long as the elaborations are consistent with the pleading.” Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 555 (7th Cir.2012).

. Judge Wood’s attempt to distinguish Quiello overlooks the fact that the payments to the employee in Quiello remained outside the employee’s control, contingent on both the restaurant's continued participation in the program and the amount of money that each restaurant’s customers spent under the program. See 420 F.Supp.2d at 26, 31. The court in Quiello considered and correctly rejected arguments identical to those made by CEC here.

. Like my colleagues, I have no quarrel with the new federal regulatory policy that took effect on July 1, 2011, but as far as we can tell, there was nothing unlawful or otherwise improper about the bonuses at issue here.