In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2383

RILEY J. WILSON, on behalf of himself
and all others similarly situated,

*Plaintiff-Appellant*,

*v.*

CAREER EDUCATION CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 C 5453 — **Geraldine Soat Brown**, *Magistrate Judge.*

ARGUED DECEMBER 3, 2012 — DECIDED AUGUST 30, 2013

Before WOOD and HAMILTON, *Circuit Judges*, and DARROW,
*District Judge.*[*]

PER CURIAM. Riley Wilson worked as an admissions
representative for Career Education Corporation (CEC),
recruiting students to enroll in CEC's culinary arts college.
Until February 2011, Wilson and his fellow admissions

---

[*] Of the Central District of Illinois, sitting by designation.

representatives worked under a contract (called the Plan) that gave them a bonus for each student they recruited, above a definite threshold, who either completed a full course or a year of study. In October 2010, however, the U.S. Department of Education (ED) issued regulations prohibiting this kind of arrangement; its new rules were scheduled to take effect in July 2011. CEC decided in effect to advance the effective date to February 2011, and pursuant to that decision, it announced to its admissions representatives that it would cease paying bonuses at the end of February 2011. It further stated that no bonuses would be regarded as earned by that date unless the student in question had completed the year of study or course by that time. Wilson sued, asserting that CEC owed him bonuses for his "pipeline" students—that is, those whom he had recruited and who were on target to complete a full course or year of study between March and June 2011. The district court found that he had failed to state a claim upon which relief could be granted and thus dismissed the action. See FED. R. CIV. P. 12(b)(6).

On appeal, Wilson presents several grounds for reversal: (1) he argues that CEC breached its contract with him and his fellow admissions representatives; (2) he argues that CEC was unjustly enriched by his efforts to enroll qualifying students and that it should be required to disgorge the bonuses that it wrongfully withheld; and (3) he argues that CEC violated the implied covenant of good faith and fair dealing—implicit in the contract—when it terminated the agreement.

**I**

We begin by setting forth the factual and procedural background of the case in more detail. Although Wilson had worked for CEC since October 2008, his claim in this case concerns only students that he enrolled during the second and third quarters of 2010. The Plan in effect during 2010 provided that a representative did not earn a bonus until the student in question had completed one year or a full course of study:

> For a particular student to be counted towards supplemental compensation for an admissions representative, the student must successfully complete either his/her academic program, or one academic year of his/her program, whichever is shorter, within the applicable evaluation period as defined below. The admissions representative will earn supplemental compensation of $400 for each such student beyond the thresholds specified in the representative's Minimum Performance Goals for number of graduates or number of students who complete one academic year of their program ("MPG Threshold").

> For example, for students an admissions representative is on record for enrolling who start their academic program at any time during the first quarter of 2010, the admissions representative will earn supplemental compensation of $400 for each such student above the employee's MPG Threshold who successfully completes his/her academic program, or one academic year of his/her academic

program, whichever is shorter, during the evalua-
tion period that extends from October 1, 2010
through June 30, 2011.

The Plan also explained that if employment was terminated
on any given day, the employee would be entitled only to
bonuses for students who had completed a year or a full course
of study before that day, and not for students "in the pipeline":

> An employee is considered to have "earned" supple-
> mental compensation under this Plan for the evalua-
> tion period during which his/her employment ends
> if, as of the employee's termination date, the em-
> ployee has exceeded his/her MPG Threshold for that
> evaluation period for students who have success-
> fully completed either their academic program or
> one academic year of their program. The employee
> will only be entitled to supplemental compensation
> … based on those students who have successfully
> completed their academic program or one academic
> year of their program, whichever is shorter, as of the
> employee's termination date, and not for any stu-
> dents who successfully complete their academic
> program or one academic year of their program after
> the employee's termination date.

Finally, the Plan reserved CEC's right to terminate the Plan
itself at any time, for any reason:

> If CEC determines at any time that this Plan should
> be modified due to the requirements or standards of
> the U.S. Department of Education or any state
> agency or accrediting commission, then CEC may be

> obligated to modify this Plan. CEC reserves the right to terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or for any other reason that CEC determines, in its sole discretion. Any interpretation of any provision of this Plan or of any regulatory authority may be made by CEC in its sole discretion.

Before February 2011, CEC paid Wilson the bonuses to which he was entitled under the Plan. During the third quarter of 2009, Wilson enrolled 23 students, eight above the MPG threshold of 15 students for that period. In the second quarter of 2010, those eight extra students completed a full course or year of study, and at that point CEC paid Wilson $3,200 in bonuses ($400 x 8).

Unfortunately for Wilson and his fellow representatives, the ED released its new regulations in October 2010, and the representatives learned that effective July 2011 educational institutions participating in Title IV federal student financial aid programs would no longer be permitted to "provide any commission, bonus, or incentive payment based in any part, directly or indirectly, on success in securing enrollments." 75 Fed. Reg. 66832, 66950 (October 29, 2010) (amending 34 C.F.R. § 668.14(b)(22)). An ED press release explained that the new regulations were geared toward "protecting students from aggressive or misleading recruiting practices, providing consumers with better information about the effectiveness of career college and training programs, and ensuring that only eligible students or programs receive aid." Press Release, U.S. Department of Education, Department of Education Establishes New Student Aid Rules to Protect Borrowers and

Taxpayers (October 28, 2010), available at
http://www.ed.gov/news/press-releases/department-educati
on-establishes-new-student-aid-rules-protect-borrowers-and
-tax (last visited August 29, 2013).

In December 2010, CEC circulated a memorandum to its
representatives announcing that, in order to comply with the
new regulations, it would pay representatives bonuses that
they earned as of February 28, 2011, and discontinue the Plan
thereafter. Wilson had recruited 11 students who began in the
second quarter of 2010, three students above the MPG thresh-
old for that quarter, and he recruited 34 students who enrolled
in the third quarter of 2010, 21 students above the MPG
threshold for that quarter. Wilson stood to earn $9,600 ($400 x
24) if all of those extra students completed their full program
or one year of study. At the time the program was terminated
on February 28, 2011, however, only one of the 24 extra
students had completed either the full program or one year,
and therefore CEC paid Wilson only $400 as a bonus.

Wilson then brought this putative class action against CEC
on behalf of all admissions representatives in his situation. He
asserted that CEC breached the terms of the Plan because, in
his view, the representatives had "substantially performed"
the work that entitled them to bonus payments once the
recruited student was in the process of completing either one
year or a full course of study by a time between March and
June 2011. Wilson argued that because the regulations did not
come into effect until July 2011, CEC could have continued
payments under the Plan until June 30, 2011. Its decision to
terminate the plan on February 28 was, he contended, arbitrary
and in bad faith. Wilson also asserted that even if CEC did not

breach the Plan, it was unjustly enriched because it benefitted from representatives' efforts to recruit extra students in anticipation of receiving bonuses, but it did not pay for this benefit. Wilson estimated that the aggregate damages to his proposed class exceeded $5 million.

The district court dismissed Wilson's individual case outright. It reasoned that the provisions of the Plan governing termination expressly provided that on any given day, a representative was entitled only to bonuses for the students who had completed their full program or a full year of study. The Plan also explicitly reserved CEC's right to terminate the program at any time. The net effect of these two provisions was to give CEC the right to terminate the program on February 28, 2011, with respect to all bonuses for which the preconditions to payment had not yet been met. The court rejected Wilson's claim for unjust enrichment on the theory that a claim for unjust enrichment may not be brought where a contract governs the relationship between the parties. The court also noted that even if there was no enforceable contract, there was no unjust enrichment because Wilson was paid a salary for his work, and an employee does not unjustly enrich his employer if he "work[s] extra hard" in the hopes of earning a bonus.

## II

For the reasons set forth in Judge Darrow's separate opinion, a majority of the panel has concluded that Wilson has successfully pleaded a claim for relief on his third theory—that CEC exercised its right to terminate the Plan in bad faith and in violation of the implied covenant of good faith and fair dealing. Judge Hamilton's separate opinion indicates his

agreement with Judge Darrow's position on the implied-covenant theory and his disagreement with aspects of the majority's decision on the breach-of-contract theory. Judge Wood would affirm the judgment of the district court, and thus dissents from the ultimate disposition of the case. Judge Darrow, however, joins Judge Wood's conclusions (a) that CEC's bonus plan was an enforceable contract, (b) that CEC had the unambiguous right to terminate that contract and to refuse to pay bonuses for students in the pipeline, and (c) that the existence of an enforceable contract precludes any recovery under an unjust-enrichment theory. In the final analysis, this means that the judgment of the district court is reversed and the case is remanded to that court for further proceedings on the implied-covenant theory.

DARROW, *District Judge,* concurring. I agree that the Plan was an enforceable contract for the reasons stated in Judge Wood's opinion, *post*. I also agree that because the Plan was an enforceable contract, the district court properly dismissed Wilson's unjust enrichment claim. I write separately because I find that although CEC did not breach the express terms of the Plan, Wilson has stated a plausible claim for breach of contract under an implied covenant of good faith and fair dealing theory.

### I. CEC Did Not Breach the Express Terms of the Plan

In interpreting contract terms, a court must first look to the plain language of the contract itself. See *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011); *Current Tech. Concepts, Inc. v. Irie Ents., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995). Reading the Plan's explicit definition of "earned" together with the Plan's termination clause shows that CEC had the right to terminate the Plan, at which time CEC was not obligated to pay bonuses covering a student who was in the pipeline at the time the Plan was terminated. The definition of "earned" in the Plan is clear: an employee does not earn a bonus until the recruited student actually graduates or completes one academic year. The Plan defines "earned":

> [a]n employee is considered to have "earned" supplemental compensation under this Plan for the evaluation period during which his/her employment ends if, as of the employee's termination date, the employee has exceeded his/her MPG Threshold for that evaluation period for students who have

> successfully completed either their academic pro-
> gram or one academic year of their program.

In addition to this definition, both examples in the Plan explain that the reason why an employee does not receive a bonus payment covering a student in the pipeline when his employment ends is because he "had not earned" that bonus before his termination date. Thus, under the express terms of the Plan, CEC was not obligated to pay Wilson a bonus for students in the pipeline at the time CEC terminated the Plan because Wilson "had not earned" the bonus. Accordingly, the district court properly dismissed Wilson's express breach of contract theory.

Viewing the termination clause in light of the Plan's final clause further supports this conclusion. See *Thompson*, 948 N.E.2d at 47 ("A contract must be construed as a whole, viewing each provision in light of the other provisions."); *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525 (Minn. 1990) ("We construe a contract as a whole and attempt to harmonize all clauses of the contract."). The final clause states: "Any interpretation of any provision of this Plan or of any regulatory authority may be made by CEC in its sole discretion." Even if I were to find the termination clause ambiguous as it relates to students in the pipeline, the Plan gave CEC the right to reasonably interpret the termination clause. See *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 330-31 (7th Cir. 2000). *Herzberger* explains that courts ordinarily engage in *de novo* review of contract provisions, meaning no party's interpretation is given any deference. But certain contracts can include language indicating that "one of the parties is to have discretion to interpret and apply the contract." *Id.* at 330. In

those cases where one party is given clear discretion to interpret the contract, the court is to defer to that party's interpretation. The level of deference varies with the type of contract and the type of interpretation provision; but, at a minimum, that party's reasonable interpretation must be upheld or the interpretation clause would be meaningless. See *Cress v. Recreation Servs., Inc.*, 795 N.E.2d 817, 852 (Ill. App. Ct. 2003) ("[A] court must give meaning and effect to every part of the contract."); *Brookfield Trade Ctr. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998) ("[W]e are to interpret a contract in such a way as to give meaning to all of its provisions."). Here, the Plan gave CEC clear discretion to interpret the termination provision; thus, we must uphold CEC's interpretation unless it is unreasonable. CEC's interpretation is not unreasonable at least for the reasons already discussed.

## II. Choice of Law

Before moving to the implied covenant of good faith and fair dealing analysis, it is necessary to first address a choice of law issue raised by the parties. The parties dispute whether the Court should apply Illinois or Minnesota law. CEC argues that Minnesota would not read the implied covenant of good faith into the Plan. I conclude that both Illinois and Minnesota would read in the implied covenant of good faith and therefore decline to analyze the choice of law issue and instead apply the law of the forum state, here Illinois. *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007); *Barron v. Ford Motor Co. of Can., Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992).

As a general rule, the Minnesota Supreme Court recognizes that contracts contain an implied covenant of good

faith—meaning that each party will not unjustifiably hinder the other party's performance. See *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984). CEC's argument that Minnesota would not imply good faith and fair dealing into the Plan relies on a misreading of a Minnesota Supreme Court opinion: *Hunt v. IBM Mid America Emp. Fed. Credit Union*, 384 N.W.2d 853, 858 (Minn. 1986). In *Hunt*, the Minnesota Supreme Court stated: "we have not read an implied covenant of good faith and fair dealing into employment contracts." *Id.* CEC urges us to read "employment contracts" broadly to include any contract related to employment, namely the Plan, instead of more narrowly to mean at-will employment contracts. The narrow interpretation is correct. For one, the facts of *Hunt* were limited to terminating an at-will employee and the court relied on unique policy reasons related to an employer's ability to discharge employees. See *Hunt*, 384 N.W.2d at 855, 858 (explaining that reading a good faith requirement into employee termination decisions would "subject each discharge to judicial incursion[]" (quoting *Parnar v. Americana Hotels, Inc.*, 652 P.2d 625, 629 (Haw. 1982))). Such policy concerns are not implicated here. Further, years after *Hunt* was decided, the Minnesota Supreme Court continued to declare that "every contract includes an implied covenant of good faith and fair dealing," *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995), suggesting that *Hunt* represents a narrow exception to the rule that all contracts imply a covenant of good faith. For these reasons, I find that Minnesota, like Illinois, would read the implied covenant of good faith and fair dealing into the Plan.

### III. Wilson States a Plausible Breach of the Implied Covenant of Good Faith

Wilson claims that CEC breached the Plan under an implied covenant of good faith and fair dealing theory. I find that (a) Wilson properly raised the implied covenant of good faith as a breach of contract theory, not as an independent cause of action; (b) under the implied covenant of good faith, CEC's discretion was limited by the reasonable expectations of the parties; (c) Wilson's allegations support a reasonable inference that the CEC exercised its discretion in a manner contrary to the reasonable expectations of the parties. Because Wilson has plausibly alleged that CEC breached the Plan under an implied covenant of good faith and fair dealing theory, the district court erred by dismissing Wilson's breach of contract claim.

    A.  Implied covenant of good faith as breach of contract theory

The implied covenant of good faith is "essentially used as a construction aid in determining parties' intent." *Anderson v. Burton Assocs., Ltd.*, 578 N.E.2d 199, 203 (Ill. App. Ct.1991). Thus, an alleged violation of the implied covenant of good faith cannot form the basis for an independent tort action or even its own cause of action. *Id.*; *Indus. Specialty Chems. v. Cummins Engine Co.*, 902 F. Supp. 805, 811 (7th Cir. 1995). Wilson properly argues that CEC's alleged breach of the implied covenant of good faith and fair dealing is a theory of liability under Count I (Breach of Contract). See *Indus. Specialty Chems.*, 902 F.Supp. at 811 ("[Plaintiff's] breach of the implied duty of good faith cannot stand as a separate count, but must

be included within its breach of contract claim …").[1] The implied covenant of good faith is simply a breach of contract theory and that is how Wilson applied it here.

>   B. CEC's discretion to terminate the Plan and refuse to pay unearned bonuses was limited by the reasonable expectations of the parties

Three conditions had to be met before Wilson could earn a bonus on a recruited student. Those conditions were: (1) the recruited student must have successfully completed either her academic program or one academic year of her program, (2) Wilson must have remained employed by CEC, and (3) CEC must not have exercised its discretion to terminate the Plan before the first two conditions were met. But unlike the first two conditions, the third condition is solely within CEC's control. When one party's contractual obligation is "contingent upon a condition particularly within the power of that party," the controlling party's discretion in bringing about the condition is limited by the implied covenant of good faith. *Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 971 (Ill. App. Ct. 1984) (collecting cases). CEC was obligated to pay Wilson a bonus only if all three conditions were met. Because the ability to satisfy the third condition was "particularly within the power" of CEC (the party obligated to pay Wilson if all conditions

---

[1] *See also Columbia Cas. Co. v. 3M Co.*, 814 N.W.2d 33, 37 (Minn. App. 2012) ("3M seeks contractual damages on alternative theories: breach of the express terms of the insurance policies and breach of a provision that is read into most contracts under Minnesota law, namely, the implied covenant of good faith and fair dealing. Although 3M cannot recover damages on both theories for the same conduct … Minnesota precedent does not preclude 3M from pleading both theories.") (internal citations omitted).

were met), the implied covenant of good faith limited CEC's ability to avoid the third condition in a manner inconsistent with the reasonable expectations of the parties. See *id.*

It bears emphasizing that CEC can breach the implied covenant of good faith even though the Plan gave CEC the unambiguous discretion to terminate the Plan and not pay unearned bonuses. See *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1154 (D.C. Cir. 1984) (explaining that a party acting in accordance with an "expressly conferred contractual power" can still breach the implied covenant of good faith). Although at-will employment contracts involve unique considerations not present here, looking at the implied covenant of good faith in the context of Illinois at-will employment cases further illustrates how an employer acting under an express contract provision can still breach the contract by exercising its discretion contrary to the reasonable expectations of the parties. An employer can terminate an at-will employee for almost any reason. But the employer's vast discretion in firing an at-will employee is still limited by the reasonable expectations of the parties. While an at-will employee has no reasonable expectation that he will be discharged only for cause, see *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1444-45 (7th Cir. 1992), an employer who discharges an at-will employee under the express terms of the contract can still breach the contract if the employer exercised its discretion in a manner contrary to the reasonable expectations of the parties. See *LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 566 (7th Cir. 1991) ("We recognize, as noted in *Gordon*, that '[t]he law seems fairly clear that an employee at will may not be deprived of commissions (in large part 'earned' prior to separating from the employer) by a

discharge made in bad faith and intended to deprive the employee of the commissions.'") (quoting *Gordon v. Matthew Bender & Co., Inc.*, 562 F.Supp. 1286, 1297 (N.D. Ill. 1983)); see also *Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987) ("[N]o one . . . doubts that an avowedly opportunistic discharge is a breach of contract, although the employment is at-will."). Those cases recognize that whether the express terms of the at-will employment contract allow the employer to discharge the employee for any reason is not the end of the analysis. See *Dayan*, 466 N.E.2d at 972 ("In each of the foregoing cases a discharged employee brought suit against a former employer alleging that the employer was inspired by an improper motive, such as a desire to deprive the employee of health or pension benefits, and therefore the termination was in bad faith. The court, in each instance, recognized that the implied covenant of good faith could limit an employer's otherwise unrestricted discretion in terminating an at-will employment contract."). Rather, the implied covenant of good faith is used as a construction aid to assist the Court in determining whether the manner in which one party exercised its discretion under the contract violated the reasonable expectations of the parties when they entered into the contract.

In other words, just because the Plan gave CEC discretion to terminate the Plan without paying unearned bonuses does not mean that CEC is necessarily incapable of abusing that discretion. See also *Carrico v. Delp*, 490 N.E.2d 972, 976 (Ill. App. Ct. 1986) (holding that a contract term allowing the bank to loan money "at bank discretion" only gave the bank "reasonable, not absolute, discretion"); *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 884 (7th Cir.

2000) ("When one party to a contract is vested with contractual discretion, it must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties."). Therefore, to show that CEC breached the implied covenant of good faith, Wilson must prove that CEC exercised its discretion in a manner contrary to the reasonable expectations of the parties. See *Beraha*, 956 F.2d at 1444-45 (citing *Dayan*, 466 N.E.2d at 972).

      C.  Wilson has plausibly alleged that CEC exercised its discretion in a manner contrary to the reasonable expectation of the parties

Resolving the issue of whether CEC acted contrary to the reasonable expectations of the parties is premature at this early stage in the case. The parties could not have reasonably expected that CEC would only terminate the Plan for good cause—the express terms of the Plan preclude such an expectation. But it was reasonable for Wilson to expect that avoiding the three conditions needed for Wilson to earn a bonus on a recruited student would not be the but-for reason for CEC exercising its discretion. See, *e.g., Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 691 (Ill. 1958) (reading in a good faith requirement where defendant acted in bad faith under the terms of the contract to avoid the plaintiff's option rights); *LaScola*, 946 F.2d at 566 (recognizing that an employer cannot exercise its discretion in bad faith to fire an at-will employee so to deprive that employee of commissions). CEC might have had a number of reasons to terminate the Plan early and refuse to pay bonuses that would have otherwise been earned before the ED regulations took effect. However, Wilson alleged that

CEC's stated explanation for terminating the Plan (that being the deadline for compliance with federal regulations) does not square with the timing of the termination. See Compl. at ¶ 20. This mismatch in explanation and action raises a permissible inference that the but-for reason for CEC's action was to avoid the three conditions needed for Wilson to earn a bonus on a recruited student and therefore CEC acted contrary to the reasonable expectations of the parties.

Another plausible expectation of the parties is found in the termination provision itself. It contemplates that CEC might have to terminate the Plan "for regulatory compliance purposes." And even though the termination clause also says CEC has the right to terminate the Plan for any reason, the fact that the parties anticipated that CEC might have to terminate the Plan "for regulatory compliance purposes" implies that the parties had a reasonable expectation about how CEC would exercise its discretion in this very situation. The parties might have reasonably expected that "for regulatory compliance purposes," (1) CEC would terminate Wilson's ability to earn a bonus when the pending regulations were announced or (2) CEC would terminate Wilson's ability to earn a bonus when the regulations became effective. Accordingly, whether this language suggests that CEC's early termination was consistent with or contrary to the reasonable expectations of the parties is unclear. But we must resolve this uncertainty in Wilson's favor at the motion to dismiss stage. See *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009) ("[W]e must construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing

all possible inferences in [plaintiff's] favor.") (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)).

At the pleading stage, Wilson must simply allege a plausible breach of contract theory. To ultimately prevail, Wilson must prove that CEC exercised its discretion contrary to the reasonable expectations of the parties. For the reasons stated in my opinion, I find it plausible that Wilson might be able to do just that.

HAMILTON, *Circuit Judge,* concurring in part and dissenting in part. I agree with my colleagues that the CEC supplemental compensation plan was an enforceable contract and that there is not currently any need to pursue a claim of unjust enrichment. I agree with Judge Darrow that plaintiff Wilson is entitled to pursue his claim for bad faith breach of the contract with CEC, both in his own right and potentially on behalf of a plaintiff class. I respectfully disagree with my colleagues, however, on Wilson's straight breach of contract claim that does not require proof of subjective bad faith. I dissent from the affirmance of the district court's Rule 12(b)(6) dismissal of that theory. I address first why Wilson has alleged a viable claim for breach of contract and then turn briefly to the bad faith theory that Wilson can pursue on remand and his unjust enrichment theory.

## I.  Breach of Contract

The contract here is defendant's "Supplemental Compensation Plan for Admissions Representatives—2010." The Plan was detailed and formal, with more than a page of definitions and detailed examples to illustrate the calculation of payments. Although these supplemental payments are sometimes called bonuses, they were not discretionary and they were also important, making up a significant part of an admissions representative's compensation. *Cf. Tatom v. Ameritech Corp.*, 305 F.3d 737, 742-44 (7th Cir. 2002) (no enforceable promise of bonus where calculation and payment were left to employer's discretion and dependent upon its overall financial success). Plaintiff Wilson has advised that when the Plan was cancelled, the payments were roughly one-third of his total compensation.

While the Plan was in effect, the delayed payment of the supplemental compensation or bonuses was subject to two, but only two, explicit conditions: (1) to be counted toward a bonus, an enrolled student had to complete the shorter of a full course or one year of study; and (2) the admissions representative had to be employed by CEC when the student satisfied that condition. The first condition was a sensible step to discourage abusive practices in which federally guaranteed loans were made to students who had neither the ability nor the intention to pursue the course of studies. The second condition is fairly common in bonus and sales commission plans.

My colleagues and I all agree that the Plan was an enforceable contract and that CEC was free to amend or terminate it. That right to amend or terminate is the source of CEC's defense and the focal point of my disagreement with my colleagues on this claim. My colleagues and I agree that this right was not unlimited. The contract would have been illusory otherwise. We also agree that the right to amend or terminate could not be applied retroactively. We disagree on what it means to apply an amendment or termination retroactively.

In analyzing the limits on amendment or termination, we must consider three time-frames: (1) prospective application of an amendment to bonuses for students not yet enrolled; (2) completely retroactive application of an amendment, including as applied to bonuses for students for whom all conditions had been satisfied at the time of amendment; and (3) application of an amendment to bonuses for students "in the pipeline," where the admissions representative had done all of his or her work but the other conditions had not yet been satisfied. (There is a fourth variation concerning the effect of the new

Department of Education regulations that made enrollment bonuses unlawful for covered education companies effective July 1, 2011, but the parties do not disagree about that possibility.)

With respect to the first time-frame, my colleagues and I agree that CEC could amend or terminate the plan on a prospective basis, as applied to bonuses for students who had not yet enrolled. Such a right to amend or terminate is essential. For example, an employer may miscalculate and learn it cannot afford to sustain a bonus or sales commission plan on a long-term basis. Admissions representatives who did not like a change in the terms of their employment would be free to reject the change by leaving the company. CEC recognized the need to reserve that right for itself and included such a provision explicitly in its contract.

With respect to the second time-frame, my colleagues and I agree that CEC was bound by the terms of the Plan to pay bonuses due where the express conditions in the Plan had been met—the student completed the required studies and the admissions representative was still employed by CEC when the bonus became payable. After both the express conditions had been satisfied, CEC could not make a retroactive change to the plan that would relieve it of its obligation to pay bonuses already earned. To put it another way, all members of the panel reject CEC's assertion in oral argument that it could rely on its reserved power to amend or terminate and simply refuse to pay under those circumstances. Otherwise, the Plan would certainly have been illusory and we should allow Wilson to proceed on his unjust enrichment claim.

My disagreement with my colleagues is over the third time-frame: whether CEC could use its power to modify or terminate the Plan to refuse to pay bonuses for students in the pipeline—those who had enrolled but not yet completed the milestone of one year or a complete program. As to those students, plaintiff Wilson had done all of his work and was waiting to see who finished their studies and how many bonuses he would earn.

What did the written Plan tell us about this question of the pipeline? Virtually nothing. Regarding this third time-frame, the contract was silent. When the contract is read as a whole, the silence is especially telling. By looking at the two specific conditions that could defeat a bonus claim—the student drops out or the admissions representative's employment ends—my colleagues conclude that Wilson and other admissions representatives should have figured out that CEC also claimed to retain a right to cancel bonuses for students still in the pipeline even where the two express conditions were later satisfied. See *post* 38-39 (opinion of Wood, J.).

With respect, the conclusion simply does not follow from the premises. The critical difference is obvious. The contract was *not* silent on what would happen to Wilson's bonuses if students dropped out or if he was fired or quit. It was very explicit. It included several paragraphs explaining under what circumstances an employee was or was not entitled to a bonus. It also included several examples to ensure the employees understood those conditions. Those detailed provisions told the employees, and tell us, nothing about the very different possibility, that the employer would simply decide one day to

keep all the employees' pipeline bonuses for itself—even where both the express conditions were later satisfied.

The Plan's express reservations concerning termination gave employees fair notice that they could not rely on their bonuses, even after having performed all of their work, if the student did not graduate or the employee's employment had ended. But contrary to my colleagues' view, it is not reasonable to expect Wilson to have understood that the contract's silence about any right to amend or terminate the program for pipeline bonuses meant that CEC also reserved the right to just keep those bonuses even when both conditions were later satisfied. Where CEC had done such a thorough job of disclaiming obligations to pay in two other situations, termination of employment or students' failures to complete their studies, it is more reasonable to expect CEC to have reserved explicitly the right to refuse to pay in this "pipeline" situation.

Where CEC was explicit about the right to withhold bonuses in one situation but not in another, it is more reasonable to interpret that silence as intentional, consistent with the principles that a contract must be interpreted as a whole and that the expression of one or a few specific items (such as conditions to defeat a bonus) often implies the exclusion of others. *E.g.*, *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 689 (Ill. 1958) (construe contract as a whole); *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 324 (Minn. 2003) (same); *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 668 (7th Cir. 2008) (Illinois law uses *expressio unius est exclusio alterius* as rule of construction, though it does not override clear language to the contrary); *In re Ruth Easton Fund*, 680 N.W.2d 541, 550 (Minn. App. 2004) (same under Minnesota law). *Cf. Duldulao*

*v. Saint Mary of Nazareth Hosp. Center*, 505 N.E.2d 314, 318-19 (Ill. 1987) (where employment contract included list of behaviors that would result in immediate dismissal, it was reasonable for employee to infer that other, unlisted behaviors would not subject her to immediate dismissal).

The most that can be inferred from the Plan's silence on this point is that it is ambiguous as applied to bonuses for students in the pipeline. See *Consolidated Bearings Co. v. Ehret-Krohn Corp.*, 913 F.2d 1224, 1233 (7th Cir. 1990) (explaining that silence creates ambiguity "when the silence involves a matter naturally within the scope of the contract as written," and that a "contract is not ambiguous merely because it fails to address some contingency; the general presumption is that the rights of the parties are limited to the terms expressed in the contract") (internal quotations omitted). When we consider a motion to dismiss on the pleadings, we should not treat contractual silence as if it were an express disclaimer that favors one party. "A court may not rewrite a contract to suit one of the parties but must enforce the terms as written. Thus, the rights of the parties are limited by the terms expressed in the contract." *A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp.*, 477 N.E.2d 30, 33 (Ill. App. Ct. 1985) (internal citations omitted). The Plan's silence on the issue did not give CEC the right to terminate bonuses for students in the pipeline where both express conditions were later met.

Given the ambiguity of the Plan language, the court should also be open to parol evidence about the parties' past course of dealings. We were told in oral argument that CEC had made changes to the bonus Plan in the past, but that it had done so only on a clearly prospective basis, for students not yet

enrolled.[1] If Wilson can support that assertion with evidence, it would be relevant to, and might even be highly probative of, the parties' understandings about whether the Plan language gave CEC the right to amend or terminate the Plan as applied to students in the pipeline. Such evidence would also be relevant to Judge Wood's assertion, *post* at 39, that Wilson "should have realized" that there were more than two situations in which an employee who fully performed could still be denied the bonuses.

The transparent unfairness of CEC's cancellation of the pipeline bonuses also should make us hesitate to interpret an ambiguous contract in this way. CEC admits that it deliberately induced the admissions representatives to rely on these promises and that it gained the benefit of their work above and beyond the call of duty. It then decided to keep for itself as much of that benefit as it thought it could get away with. Wilson had done all of his work to recruit the students in question. He seeks payment only for students as to whom the only express conditions on payment of the bonuses were in fact satisfied. It was not fair for CEC to change the rules in the middle of that game, and certainly not without clear warnings that it reserved the right do so. Much of contract law is designed to fill in the blanks in a contract in a way that we think the parties most likely would have agreed if they had addressed the point specifically. This contract gives us no reason to expect that the employees should have known they were agreeing to give CEC complete power to act opportunisti-

---

[1] "A party who appeals from a Rule 12(b)(6) dismissal may elaborate on her allegations so long as the elaborations are consistent with the pleading." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012).

cally, to take back the promised bonuses after it had received the benefits of the employees' efforts.

Then-Circuit Judge Scalia explained this point for the D.C. Circuit. An employer retroactively raised a sales representative's sales quotas used to calculate commissions and then terminated his employment. The employer claimed its commission plan gave it complete discretion to take these actions. The court rejected the employer's argument in terms that apply here: "Where what is at issue is the retroactive reduction or elimination of a central compensatory element of the contract—a large part of the *quid pro quo* that induced one party's assent—it is simply not likely that the parties had in mind a power quite as absolute as [the employer] suggests. In the present case, agreeing to such a provision would require a degree of folly on the part of these sales representatives we are not inclined to posit where another plausible interpretation of the language is available." *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1154 (D.C. Cir. 1984) (reversing summary judgment in favor of former employee and remanding for trial on bad faith claim, applying general principles of contract law).

Along these same lines, Judge Posner has written, "the fundamental function of contract law (and recognized as such at least since Hobbes's day) is to deter people from behaving opportunistically toward their contracting parties, in order to encourage the optimal timing of economic activity and to make costly self-protective measures unnecessary." Richard A. Posner, Economic Analysis of Law 81 (3d ed. 1986), quoted in *Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987) (reversing summary judgment and ordering trial on claims by former employee-shareholder). That logic applies here. It is not

appropriate to interpret the contract's silence to allow CEC's opportunistic grab to keep the pipeline bonuses, and certainly not to do so without evidence of either past dealings or Wilson's actual knowledge.

Judge Hall solved this problem correctly in *Quiello v. Reward Network Establishment Services, Inc.*, 420 F. Supp. 2d 23 (D. Conn. 2006). Her opinion is persuasive as a matter of general contract law, and the relevant facts are not distinguishable from this case. In *Quiello*, the plaintiff's job was to sign up restaurants to participate in loyalty and reward programs. His employer provided for sales commissions under plans that it could amend or terminate at any time, as here. After the plaintiff signed up a restaurant, he had no further responsibilities for the account. The ultimate payment of the commissions depended on factors beyond the plaintiff's control, including the restaurant's continued participation and customer usage levels. See *id.* at 26. The employer then not only reduced the commission for new sales, which it surely had the right to do, but also tried to reduce the commissions for restaurants that the plaintiff had signed up before the effective date of the new plan.

*Quiello* thus shares with this case: (1) an employee who performed all of his work toward sales commissions or bonuses; (2) the ultimate payment of which was subject to conditions that were outside his control; (3) an employer that tried to use its power to amend the contract to reduce its obligation to pay commissions for the "pipeline" business; and (4) contract language that was ambiguous as to the ability to impose the amendment on pipeline business. The court in *Quiello* correctly reasoned that the ambiguous contract should

be interpreted in the fairer, more reasonable manner as not applying to pipeline business. *Id.* at 30–32. The *Quiello* court actually granted summary judgment in favor of plaintiff on his breach of contract claims. It would be premature for us to go so far in this appeal, of course, but the reasoning of *Quiello* is sound, applies here, and calls for reversal of the district court's dismissal.[2]

## II.  Bad Faith Termination

Wilson also argues that even if the Plan gave CEC the power to cancel pipeline bonuses, it breached a duty of good faith and fair dealing by cancelling bonuses four months before the new federal regulations took effect to prohibit them. This duty of good faith and fair dealing is particularly important where one party reserved a discretionary right to modify or terminate the contract in a way that would give that party the opportunity to take unfair advantage of the other. See *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 884 (7th Cir. 2000) (applying Illinois law and reversing summary judgment where defendant's good or bad faith was genuinely disputed issue). Even if CEC had such a reserved power, Judge Darrow correctly explains that it had a duty to exercise that power in good faith, and the district court erred by dismissing this claim on the pleadings.

---

[2] Judge Wood's attempt to distinguish *Quiello* overlooks the fact that the payments to the employee in *Quiello* remained outside the employee's control, contingent on both the restaurant's continued participation in the program and the amount of money that each restaurant's customers spent under the program. See 420 F. Supp. 2d at 26, 31. The court in *Quiello* considered and correctly rejected arguments identical to those made by CEC here.

I therefore concur in Parts II and III of Judge Darrow's opinion and offer a few further observations about the bad faith theory. Plaintiff Wilson has alleged a solid factual basis for inferring bad faith. CEC argues it was just being a good citizen. It was acting to comply with new federal regulations that prohibited such bonuses in the for-profit education world.[3] But CEC made this change effective four months before the regulations took effect. By taking that step, Wilson alleges, CEC simply kept for itself more than $5 million it should have paid to its admissions representatives. That looks like the "avowedly opportunistic conduct" that we recognized as actionable in *Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987) (applying Illinois law).

Perhaps CEC can persuade a trier of fact that its seizure of more than $5 million was merely a fortuitous side effect of its desire to be a good citizen by complying with the new regulations before it was required to do so. But CEC's reliance on the regulations as a defense could reasonably be deemed a pretext for simple greed at the expense of the admissions representatives who contributed to its success. This issue of good or bad faith cannot be resolved in favor of CEC on the pleadings alone. Given the documentary evidence before us even on the pleadings, it seems unlikely the issue could be resolved on summary judgment as well.

It will be important on remand to focus on the correct issue, which is the *timing* of the termination. All members of the

---

[3] Like my colleagues, I have no quarrel with the new federal regulatory policy that took effect on July 1, 2011, but as far as we can tell, there was nothing unlawful or otherwise improper about the bonuses at issue here.

panel agree that CEC could terminate the Plan when the new Department of Education regulations took effect on July 1, 2011. The critical issue on remand is whether CEC acted in bad faith in deciding to terminate the Plan earlier than required so as to seize for itself the pipeline bonuses that Wilson and other admissions representatives were reasonably expecting to be paid as students completed their studies.

Judge Darrow has framed the issue in terms of whether CEC acted contrary to the reasonable expectations of the parties. See also *Tymshare, Inc.*, 727 F.2d at 1154–55. The relevant expectations are those based on the objective indications of CEC's promises and behavior, including CEC's past course of dealing with Plan amendments. The objective view of the admissions representatives' expectations is important for purposes of class certification, as well, for the decision on the bad faith claim should focus on CEC's motives, applicable to all, and not on circumstances unique to each employee.

### III.  Unjust Enrichment

Throughout this litigation, CEC has argued that its Plan was only an illusory contract and that its admissions representatives were chumps if they thought they had actually been promised anything the law would recognize. My colleagues and I agree that CEC is wrong about that, but CEC seems unable to resist the temptation to continue trying to make the contract illusory. It would not surprise me if CEC were to try on remand to develop a new theory for rendering the Plan only an illusory contract. If that happens, the district court should consider allowing Wilson to amend his pleadings to restore the claim that we reject at this stage of the proceedings. That is,

notwithstanding our decision today, it is at least possible that CEC could try to defend itself on the surviving claim in such a way as to resuscitate the unjust enrichment claim. See FED. R. CIV. P. 15(b); 6A Wright & Miller, Federal Practice & Procedure § 1493 (3d ed. 2013) (explaining liberal use of Rule 15(b) to amend pleadings to enable just resolution of suits).

If the CEC Plan were an illusory contract, then Wilson would have a viable claim for unjust enrichment under either Illinois or Minnesota law. To state an unjust enrichment claim under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp. Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). The elements are phrased differently but seem to be essentially the same under Minnesota law. *Southtown Plumbing, Inc. v. Har-Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. App. 1992); see also *Cady v. Bush*, 166 N.W.2d 358, 361-62 (Minn. 1969) (theory of unjust enrichment can "support claims based upon failure of consideration, fraud, mistake, and other situations where it would be morally wrong for one to enrich himself at the expense of another").

Wilson has alleged facts supporting all of these elements. First, CEC induced performance by the plaintiff and other admissions representatives. It did so by making these very specific promises of bonuses, which CEC even admits it wanted and expected its admissions representatives to rely on. Second, CEC received a benefit as a result of that reliance. Employees worked above and beyond the call of duty, exceeding the standards set for their performance and recruiting

enough students to earn bonuses, which provided substantial benefits to CEC itself. Third, even though all conditions for paying the bonuses had been satisfied, CEC refused to pay the bonuses it had offered. Finally, as plaintiff Wilson has argued, one could reasonably find that CEC acted in bad faith and that it would be unjust and/or morally wrong to allow CEC to retain the benefit discussed above under both Illinois and Minnesota law. For these reasons, the district court should stay alert on remand to the possible need to revive the unjust enrichment theory if CEC continues to try to show the Plan was only illusory.

Finally, the district court also rejected unjust enrichment on a flawed alternative theory: that an employer is not unjustly enriched by withholding a promised bonus because the employee was still paid his base salary. *Wilson v. Career Educ. Corp.*, 2012 WL 1246328, at *8 (N.D. Ill. 2012), citing *Hegel v. Brunswick Corp.*, 2011 WL 1103825, at *9 (E.D. Wis. 2011). That reasoning is sound when the prospect of a bonus is left to management's discretion, as was the case in *Hegel* itself. See 2011 WL 1103825, at *5 (employer reserved right to "revise, discontinue or cancel this plan *or any awards* associated with the plan at any time," thus promising to render future performance only if it decided to do so) (emphasis added). That reasoning does not extend, however, to a case like this one, where the promise of bonuses was specific and was conditioned only on express conditions that were actually satisfied. Without that limit, the district court's reasoning would call into question the enforceability of any contractual sales commissions so long as the sales representative is also paid a base

salary. Yet such promises of sales commissions are regularly enforced, of course.

For these reasons, I join in the judgment reversing and remanding the case to the district court on plaintiff's bad faith theory, but I respectfully dissent from the rejection of his conventional breach of contract theory.

WOOD, *Circuit Judge,* concurring in part and dissenting in part. Wilson is entitled to overcome CEC's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) only if he can show either (1) that CEC breached its contract with him, or (2) that it was unjustly enriched by its decision to stop bonuses for students who had not completed a year of study or a course as of February 2011, or (3) that he has stated a claim on the question whether CEC committed an independent violation of the implied covenant of good faith and fair dealing implicit in his contract with the company. I address those three points in turn, applying a *de novo* standard of review and drawing all inferences in Wilson's favor. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).

## I. **Breach of Express Contract**

### A. Choice of Law

At the outset, the parties dispute whether Illinois or Minnesota law applies. Wilson prefers the law of Illinois, and CEC that of Minnesota. I do not see what the fuss is about: the parties agree that there is no substantive difference between the laws of these two states. In either one, to establish a breach of contract a party must show (1) that a valid and enforceable contract existed, (2) that the plaintiff performed on the contract, (3) that the defendant breached it, and (4) that the plaintiff was injured. *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001) (citing *Hickox v. Bell*, 552 N.E.2d 1133, 1143 (Ill. App. Ct. 1990)); *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000). When the law is the same in both states, rather than grappling with the largely theoretical question of which law applies, the court should apply the law

of the forum state, here Illinois. *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007); *Barron v. Ford Motor Co. of Can., Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992). I proceed on that basis.

## B. Enforceability of Contract

Both parties question whether this contract was illusory and therefore unenforceable: CEC argues that the right to bonuses under the contract is not enforceable because it reserved the right to terminate the Plan at any time, while Wilson argues in the alternative that the contract is enforceable, but if it is not, then it is illusory and no barrier to his unjust enrichment claim.

Initially, it is important to recall that Illinois courts look at the contract as a whole, not each particular clause, when they consider whether a particular agreement is illusory. See, *e.g., Keefe v. Allied Home Mortg. Corp.,* 912 N.E.2d 310, 315 (Ill. App. Ct. 2009). Bearing that in mind, this court has held that a statement of an employer's compensation policy reflects at most an illusory contract if it does not provide a specific enough promise to be enforceable. *Tatom v. Ameritech Corp.,* 305 F.3d 737 (7th Cir. 2002). In *Tatom*, the Compensation Statement identified a target bonus of $50,500, but it said that the bonus could be more or less "depending on Corporate and business unit financial results, as well as [the employee's] individual performance." *Id.* at 743. That Compensation Statement also expressly "d[id] not constitute a guarantee that any particular amount of compensation will be paid" and it "d[id] not create a contractual relationship or any contractually enforceable rights between [the employer] and the employee." *Id.* We

found the Compensation Statement too vague to be an enforceable promise. But we explained that a statement of an employer's compensation policy could support an enforceable contract if "the language of the statement sets forth a promise in terms clear enough to cause a reasonable employee to believe that an offer has been made," the employee is aware of the statement and reasonably construes it to be an offer, and the employee accepts the offer by commencing or continuing to work after reading the statement. *Id.* at 742.

CEC's Plan is far more specific than the Compensation Statement in *Tatom*. The statement in *Tatom* did not provide enough details of how supplemental compensation would be calculated to allow a determination of what the employer would owe the employee or when it was obligated to pay additional compensation. It set a target for a bonus, but it said that the bonus could be more or less depending on employee performance and business performance, without specifying how these factors would influence the ultimate decision. In contrast, CEC's Plan transparently indicates how to calculate the bonus payments to which Wilson was entitled before February 28, 2011. Indeed, it is also easy to see how much he would have earned for the period between March and June 2011, if his students remained enrolled and the Plan had not been terminated. Finally, the bonus was just one part of Wilson's overall agreement. I therefore conclude that there is nothing illusory in the promises CEC made, and that the Plan is an enforceable contract. This conclusion flows from the language of the agreement itself. I therefore do not agree with Judge Hamilton's suggestion that Wilson should have another opportunity on remand to amend his pleadings to restore the

theory of an illusory contract to the case. Principles of law of the case should bar any such move; CEC will equally be bound by what has been decided here.

### C. Breach

The next question is whether CEC breached its express agreement with Wilson. (I discuss in part III the question whether there was a breach of contract based on the implied covenant of good faith and fair dealing.) As Wilson reads the Plan, CEC was contractually obligated to pay him $9,200 in bonuses for the 23 students whom he enrolled in the second and third quarters of 2010. These people were "in the pipeline" to complete a full course of study between March and June 2011, although there was a chance that one or more might not do so. He argues that with respect to these students, *his* "work was completed; each student was enrolled and now it was up to them to remain enrolled or graduate their program." At least with hindsight, it would be easy enough to see how many students satisfied that remaining criterion in the Plan and thus how much of a bonus Wilson earned. But by pointing out that he had to wait for the students to complete a year or to graduate, Wilson has highlighted the problem with his position: CEC's obligation to pay a bonus was not tied solely to Wilson's performance; it depended equally on the success of the students. (For what it is worth, I see nothing outrageous about this arrangement: it appears to have been designed to prevent any temptation on the recruiter's part to stack the classrooms with "students" who have no intention of completing serious work, by specifying that the bonus is earned only for successful students. Compare *Leveski v. ITT Educ. Servs.,*

*Inc.*, 719 F.3d 818 (7th Cir. 2013) (*qui tam* action implicating ED rule against compensation based on student recruitment).)

The Plan expressly provided for the possibility that Wilson would substantially perform but nonetheless not be eligible for a bonus. This could happen in any of three ways: students could drop out, Wilson's employment could be terminated, or, as happened here, CEC could exercise its right to terminate the Plan. The Plan states (and Wilson concedes) that in either of the first two scenarios, he would not be entitled to bonuses for the pipeline students. I cannot see why he would be entitled to a bonus based on the same substantial performance in the third scenario, where the only difference between that one and the first two is that CEC's exercise of an agreed retained power, rather than the student's attendance or Wilson's employment, is the reason why the Plan is changed before the student finishes a year or a course of study. Though Wilson was understandably disappointed by not receiving the bonuses he hoped for, he should have realized that this was possible in light of the provisions of the Plan.

Even if the Plan could be terminated or amended, however, Wilson urges this court to find that CEC's action was impermissibly retroactive as applied to bonuses that would have been earned between March through June 2011 (assuming no glitches). But this is just another way of putting the argument I have just rejected. CEC did pay Wilson all bonuses he had earned as of February 28, 2011. The Plan would have been terminated retroactively only if CEC had refused to pay Wilson bonuses for students who completed a full course or year of study on or before February 28, 2011. Wilson analogizes this case to one in which the District of Connecticut (applying

Connecticut law) concluded that an employer who managed a restaurant discount club breached its compensation agreement by retroactively altering the commission rate for a representative who solicited restaurants to participate in the discount club. *Quiello v. Reward Network Establishment Servs., Inc.*, 420 F. Supp. 2d 23 (D. Conn. 2006). Without delving into all the details of that case, I note that the representative there was entitled to a percentage of each customer's expenditure (specified by the agreement in force when he registered the restaurant) at the time the customer went to the restaurant; there were no further conditions that he had to satisfy once the customer spent the money. Here there were such conditions. This case would be analogous to *Quiello* if Wilson's 23 extra students had already completed one year of study when the Plan ended in February 2011, entitling Wilson to 23 bonuses of $400, but CEC had attempted to subject Wilson to a new Plan, under which representatives were paid $200 per student rather than $400, and it then had paid Wilson only $200 for students who had completed their courses before the new Plan came into force. In my view, *Quiello* thus is not even helpful persuasive authority for Wilson.

## II. Unjust Enrichment

Because I find that a valid, enforceable agreement governed the relationship between Wilson and CEC, it follows for me that Wilson's unjust-enrichment claim cannot succeed. Restitution is an extraordinary remedy. Where no contract exists, the court constructs an imaginary agreement (an "implied" contract) because the plaintiff conferred a benefit on the defendant under the mistaken belief that a contract existed. Under those circumstances, "the defendant's retention of the

benefit violates the fundamental principles of justice, equity, and good conscience." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012) (quoting *A.P. Props., Inc. v. Rattner*, 960 N.E.2d 618, 621 (Ill. App. Ct. 2011)). The purpose of restitution is to create a substitute for the contract that does not exist, not to upset the allocation of risk that is reflected in an existing agreement. *Id*. ("A plaintiff cannot pursue [restitution], however, if his relationship with a defendant is governed by an express contract."); *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 689 (7th Cir. 2004) ("The reason for prohibiting a claim of unjust enrichment between contracting parties is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract."); *Hayes Mech., Inc. v. First Indus., L.P.*, 812 N.E.2d 419, 426 (Ill. App. Ct. 2004) ("A quasi-contract, or contract implied in law, is one in which no actual agreement between the parties occurred, but a duty is imposed to prevent injustice.").

Wilson agreed to recruit students in exchange for his ordinary salary and the potential that some of his enrolled students would complete a full year or a full course of study, thereby entitling him to a bonus. In other words, the potential of earning a bonus, not the guarantee of earning one, was part of the consideration for Wilson's performance. In essence, Wilson is arguing that any agreement that conditions benefits on factors outside the employee's control might become the basis for a restitution claim. That is not the law; to the contrary, restitution is not a remedy for a party whose "expectations were not realized under the contract." *Util. Audit, Inc.*, 383 F.3d at 689. I thus conclude that Wilson cannot prevail under an unjust-enrichment theory.

### III. Covenant of Good Faith and Fair Dealing

Finally, Wilson argues that CEC breached the contract in a different way, by violating its obligation of good faith and fair dealing when it amended the Plan in February, rather than waiting until the deadline of July 2011 when the regulations came into effect. Illinois courts hold that every contract rests on good faith and fair dealing between the parties. See *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992), citing *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 690 (1958); *First Nat'l Bank of Cicero v. Sylvester*, 554 N.E.2d 1063, 1069 (1990). But critically from my point of view, Illinois courts also hold that the covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract. As the Illinois Appellate Court said in *Anderson v. Burton Assocs., Ltd.*, 578 N.E.2d 199 (Ill. App. Ct. 1991), "[w]hile it is true that this obligation exists in every contract in Illinois, (see *Martindell v. Lake Shore Nat'l Bank* (1958), 154 N.E.2d 683), it is essentially used as a construction aid in determining parties' intent, (*Martin v. Federal Life Ins. Co.* (1982), 440 N.E.2d 998) and 'vague notions of fair dealing' do not form the basis for an independent tort. *Foster Enters. v. Germania Fed. Sav.* (1981), 421 N.E.2d 1375." 578 N.E.2d at 203 (parallel citations omitted); see also *Beraha.*, 956 F.2d at 1443-44 ("A lack of good faith does not by itself create a cause of action like a failure to exert best efforts creates when a contract contains an implied best efforts obligation. Instead, the covenant guides the construction of explicit terms in an agreement.") (citation omitted).

Before one turns to this covenant of good faith and fair dealing, it is therefore necessary to find that the contract in question is susceptible to more than one interpretation. The

Illinois Supreme Court put it this way in *Martindell*: "Every contract implies good faith and fair dealing between the parties to it, and *where an instrument is susceptible of two conflicting constructions*, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted." 154 N.E. 2d at 690 (emphasis added). To say that a contract is susceptible of two conflicting constructions is, in my opinion, another way of saying that it is ambiguous. It is well established that a party who can show that a contract is ambiguous is entitled to survive summary judgment and to introduce evidence that will resolve the ambiguity. The Illinois Appellate Court discussed this rule in *Gassner v. Raynor Mfg. Co.,* 948 N.E.2d 315 (Ill. App. Ct. 2011), as follows:

> In any case, under both the four corners rule and the provisional admission approach, the first step is to determine whether an ambiguity exists. An ambiguity exists where there is doubt as to the true sense or meaning of the words themselves or an indefiniteness in the words' expression, resulting in a difficulty in the application of the words under the circumstances of the dispute that the contract is supposed to govern. … [Accordingly,] … we proceed to determine whether the disputed language in the contract is ambiguous so as to require the introduction of parol evidence and preclude summary judgment.

*Id.* at 328 (citations omitted).

If, as I believe, the Plan is an unambiguous contract, then the background covenant of good faith and fair dealing has no

role to play in its interpretation. (No one is saying that this is an illegal contract, nor has Wilson offered an unconscionability argument; even if he had, it is my belief that there is nothing unconscionable about the compensation structure to which he agreed.) The majority relies heavily on the fact that the Plan is silent about the particular set of circumstances that unfolded here. But no contract ever spells out how the parties plan to address every tiny detail that might arise in the future. Instead, contracts allocate risk more generally. This contract did everything that was necessary when it provided a default rule stating that "CEC reserves the right to terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or for any other reason that CEC determines, in its sole discretion." That does not look like silence to me. It is an unambiguous term that gives CEC the right to terminate the Plan at any time, for any reason, as Judge Darrow agrees, *supra* at 9-10. That means that there is no basis for invoking the covenant of good faith and fair dealing as a principle of construction. *Martindell*, 154 N.E. 2d at 690. Unless that covenant enters the picture, there is no way to override plain contractual language (which reflects Wilson's acceptance of a certain amount of compensation uncertainty) and to introduce a judicial exception whenever a firing (or cut in compensation) is allegedly for invidious motives or opportunistic. Opportunism exists only if one side has sunk costs that cannot be recovered by the time the other side acts; it is not a problem when an anticipated event comes to pass.

Even if the majority is suggesting that the cancellation of Wilson's bonuses was somehow analogous to the firing of someone whose employment is at will, I do not see how his

case can go forward. In the more extreme case of job loss, many people try to sue, claiming that the act of firing violated the employer's duty of good faith and fair dealing because it was invidious or opportunistic. They regularly lose these lawsuits if they are employees at will. Indeed, recognizing a cause of action in those circumstances would spell the end of the doctrine of employment at will. (Some people might not mourn its passing, but it is firmly entrenched in Illinois law, and it is our duty to follow Illinois law in this respect.) See, *e.g.*, *Beraha*, 956 F.2d at 1445 ("[F]ederal courts interpreting Illinois law have cogently reasoned that the covenant of good faith, which is a principle of construction, gives way to the rule that an employment at-will contract is terminable for any reason. Otherwise, the employment at-will principle would be meaningless.")(citing cases); *Zewde v. Elgin Cmty. Coll.*, 601 F. Supp. 1237, 1250 (N.D. Ill. 1984) ("Illinois courts have consistently ruled that the parties to an employment at-will contract may terminate it for a good reason, a bad reason or no reason at all ... . The 'good faith' principle does not have an independent life, and does not independently create a cause of action. Instead [it] comes into play in defining and modifying duties which grow out of specific contract terms and obligations ... . It gives way to specific contract provisions which directly contradict it. Thus, the usual rule, that an at-will agreement is terminable for any reason, controls. Otherwise, that rule would be meaningless.")(quotation marks and citations omitted).

I therefore do not agree with my colleagues that we should construe the unambiguous language in the Plan reserving the right to terminate or amend at any time, for any reason, as if there were an asterisk at the end that made an exception for

changes in employment terms that might be malicious or opportunistic. What right was CEC reserving, if not the right to change the Plan if it decided that its economic interests would be better served that way? And if it has the right to terminate or amend the Plan, then I see no reason why this right did not encompass a decision to say that bonuses were not earned until *all* criteria were met—both the student's enrollment, and the student's completion of the necessary courses or time.

The Plan, read as a whole, imposes three conditions before a bonus is earned: (1) that the qualifying student complete a year or a course of study; (2) that Wilson is still employed by CEC as of that time; and (3) that CEC has not as of that time exercised its right to terminate or modify the Plan. Like an at-will employment contract, the Plan was designed to allow CEC to cancel not-yet-earned bonuses for any reason—for instance, if its operating costs were unexpectedly to increase such that it could not afford to pay bonuses for students in the pipeline during a given quarter.

It is true that the duty of good faith is particularly important where, as here, one party reserves the right to modify or terminate the agreement. As we have recognized, "[w]hen one party to a contract is vested with contractual discretion, it must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties." *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.,* 225 F.3d 876, 884 (7th Cir. 2000). But the key question comes back to the reasonable expectations of the parties. Here, they have spelled out those expectations in CEC's reservation of rights.

Where there is an express reservation of rights to terminate or amend at any time and for any reason, as there is in our case, there is no baseline against which to find termination arbitrary, capricious, or inconsistent with expectations. The disappointed party has no right to expect non-arbitrary modification or termination, because the contract expressly declines to condition those possibilities on good cause or anything else. Just as with "at-will" employment arrangements, the employee cannot have any reasonable expectation that the Plan will be modified only "for cause." Even taking these facts in the light most favorable to Wilson, I see nothing to indicate that CEC violated its duty not to terminate or amend the Plan in a manner inconsistent with his reasonable expectations. Indeed, the Plan expressly disavowed any expectancy of a bonus before students completed a year.

The decision to bring one's company into compliance with federal regulations before the last minute can hardly be branded arbitrary or capricious. CEC might have had a number of good reasons to act promptly—among them, its desire to maintain a positive relationship with the ED, which regulates CEC and provides CEC's students with federal funding. Unlike my colleagues, therefore, I would find that the district court properly rejected this theory of liability.

## IV. Conclusion

While I can understand Wilson's disappointment, the Plan to which he agreed did not entitle him to bonuses at the moment he substantially performed by enrolling students. CEC was therefore within its rights to modify the Plan when and as it did. That the Plan allowed for this disappointment does not render its promises illusory, nor does it mean that it violated a covenant of good faith and fair dealing. Accordingly, I would affirm the judgment of the district court, and I thus dissent from the decision to remand on this theory for further proceedings.